No. 48,128

The State of Kansas, *Appellee*, v. David R. Bohanan, *Appellant.*

(551 P. 2d 828)

Opinion filed June 12, 1976.

*John C. Roberts,* of Wichita, argued the cause, and was on the brief for the appellant.

*Robert L. Kennedy, Jr.,* assistant district attorney, argued the cause, and *Curt T. Schneider,* attorney general, and *Keith Sanborn,* district attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

Prager, J.: This is a direct appeal in a criminal action in which the defendant-appellant, David R. Bohanan, was charged with murder in the first degree (K. S. A. 21-3401) and aggravated robbery (K. S. A. 21-3427). He was tried by a jury, convicted of murder in the second degree (K. S. A. 21-3402), and found not guilty of aggravated robbery.

The factual circumstances of the homicide as disclosed at the trial were for the most part undisputed and are essentially as follows: Some time during the morning hours of September 13, 1974, Arthur R. Mendoza, was shot in the back of the head and killed by a .38-caliber bullet. At that time Mendoza resided in an apartment in Wichita with Ernest Rodriguez and Eddie Jaso. Mendosa was unemployed but made his living selling drugs, especially marijuana. Mendoza and the defendant, David R. Bohanan, were ap-

parently casual acquaintances. Early on the morning of September 13 the defendant called Mendoza's apartment and had a conversation with Ernest Rodriguez concerning the purchase of marijuana. Rodriguez was just about ready to leave for his employment and he suggested that the defendant speak with Mendoza later in the morning. Rodriguez then left for work and did not return to the apartment until shortly after noon. He found the apartment in shambles and Mendoza lying dead in a pool of blood with a severe wound on the back of his head. The police were summoned and an investigation commenced. One of the detectives investigating the case, Darrell Oakley, learned from a neighbor that a black male had been observed running from the apartment. The man slipped and slid down an embankment into the side of a red car parked nearby. This man then got in the car which immediately left the scene. The Wichita detective interviewed Rodriguez and Jaso and obtained a list of names of persons known to have been in the apartment recently. One of the names provided was that of the defendant, David R. Bohanan. Oakley was acquainted with the defendant and attempted to locate him. He drove to the defendant's house at approximately 6:00 p. m. on the evening of September 13. Only the defendant's brother and sister were home and Detective Oakley asked them to have the defendant call him when he came in. Oakley returned to the police station.

Upon his return to the police station Oakley was informed that Arthur Mendoza had, in fact, been shot to death. Not long thereafter Oakley was advised that David Bohanan had called by telephone asking for Oakley. Detective Oakley and Detective Allen then left for Bohanan's house arriving there at approximately 7:45 p. m. At this time Detective Oakley possessed only the following information about the Mendoza homicide: He knew that Mendoza had been shot in the back of the head by an unknown firearm and that the wound was discernible as a gunshot wound only by a close examination of the wound. He also had information that during the morning of the homicide an unknown black male had been seen running away from the vicinity of Mendoza's apartment, had slipped, slid down an embankment, and had run into a red automobile parked at the curb. This man got into the red automobile which immediately departed. When the police car containing detectives Oakley and Allen drove up in front of the defendant's home, the defendant was on the porch. Oakley asked defendant to come to the police car and the defendant did so. The defendant sat in the

right-rear seat and the two detectives in the front seat. Before the defendant got into the police car Oakley informed him that a homicide had been committed. At that time Oakley did not consider the defendant to be a suspect. Detective Oakley first asked the defendant if he knew anyone who owned a red car. The defendant said that the only person that he knew who owned a red car was a friend, Wayne Woods. He described the Woods vehicle. Detective Oakley then asked the defendant where he had been on the night before and that morning. The defendant stated that he had been at several friends' houses, at a night club, and finally at his girlfriend's house. The defendant further stated that he had awakened that morning and had a telephone conversation with Ernest Rodriguez in which he asked if Rodriguez had any marijuana. Rodriquez advised him that he, the defendant, would have to come over to the apartment later to see Arthur Mendoza. Later that morning defendant drove with Wayne Woods in Woods' car to the 1500 block of Hillside, a short distance from the Mendoza apartment. The defendant stated that he went to the Mendoza house, knocked on the back door, received no answer, and then returned to the car. Detective Oakley then told the defendant that that did not sound right because he had been informed that a black male was seen running across the yard, sliding down the bank into the side of a red car, and then get into the car. In response the defendant said that was right, that he had run from the house after almost being bitten by a dog. The defendant then stated that when he tried the back door of Mendoza's house the door was unlocked, that he went into the house and noticed that the apartment was all "torn up", and that he ran to the car. Oakley said that did not sound right, for a disarranged living room to cause a person to run. According to Oakley the defendant then said that was right, that he had gone up and knocked on the back door, did not get an answer, and on trying the door found it unlocked. He walked into the apartment and found the place torn up. He called Mendoza's name and, as he entered the living room area, he could see Mendoza lying on a mattress with a hole in his head with blood running out of it. He further stated that he did not know if Mendoza was alive or not and then ran out of the house.

At this point Detective Oakley ceased questioning the defendant. Oakley stated that in view of defendant's statement that he had observed a hole in Mendoza's head in the apartment, Oakley concluded that the defendant had to have been there when Mendoza

was shot or had shot him. At that point Oakley asked the defendant to accompany him to the police station. At the suppression hearing Oakley testified in substance that he did not consider the defendant to be under arrest when he was questioned in the police car, nor did he suspect that the defendant was involved in the killing until the defendant mentioned seeing the wound in the back of the defendant's head. At that point Oakley suggested that the defendant accompany the detectives to the police station. At that time Oakley considered the defendant to be under arrest.

At the police station Detective Oakley handed the defendant a printed form containing a statement of his constitutional rights as required by *Miranda v. Arizona,* 384 U. S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966). The defendant read aloud the *Miranda* warning as contained in the printed form. The defendant initialed each paragraph as each was explained by Oakley and the defendant signed the form at the bottom indicating that he understood his rights. The defendant asked Oakley to explain the meaning of the word "coercion", which Oakley did. Detective Oakley then asked the defendant if he wished to talk to the detectives and the defendant stated that he would do so. The defendant then proceeded to give the statement which was later admitted into evidence. As he had previously done, the defendant narrated to Oakley different versions of his activities that morning. The defendant's final version of the circumstances surrounding the killing was that he had gone to the Mendoza apartment; that he and Mendoza had fought after Mendoza had drawn a gun on him; that he had taken the gun away from Mendoza; that Mendoza had threatened him with a red hot iron; that he pushed Mendoza away several times and finally shot him with the gun to keep him from getting up. Following the giving of this oral statement, the defendant wrote down the same version of what had happened. When he had finished it, Oakley asked the defendant if he would make a taped statement. The defendant agreed and a taped statement was made at approximately 1:00 a. m. on the morning of September 14. Following the giving of the taped statement the defendant accompanied Detective Oakley to his home where they retrieved bloodstained clothing worn by the defendant that morning at the time of the shooting. The defendant also accompanied the detective to his girlfriend's house where the pistol was retrieved. The defendant was subsequently charged with first-degree murder and aggravated robbery.

At the trial the state introduced into evidence the bloodstained clothing and the pistol which fired the bullet recovered from Arthur Mendoza's brain. Ernest Rodriguez testified about his conversation with the defendant at 8:00 a. m. on the morning of the killing and the discovery of Mendoza's body at 12:15 p. m. Rodriguez further testified as to a conversation he had with the defendant later when they were being held in jail in the same cell. In this conversation defendant told Rodriguez that Mendoza threatened him with a gun, that a fight ensued, that defendant obtained possession of the pistol and that he fired the gun as Mendoza came at him with a hot iron. Wayne D. Woods testified that on the morning of September 13 he gave the defendant a ride to Mendoza's apartment and that on returning from the apartment the defendant had a gun and blood on his clothing. By way of explanation the defendant told Woods that he and another guy got in a fight, that the other guy had an iron and was going to burn him, that they struggled, and that he got behind him and hit him in the head. Other witnesses for the state described the discovery of the body of Mendoza, the location of an iron clutched in the victim's right hand underneath his body, and the results of the autopsy and other scientific tests conducted by the police department laboratory. This testimony established beyond any question that the defendant Bohanon had shot Arthur Mendoza with Mendoza's pistol.

The state called as its last witness Darrell Oakley to testify concerning the statements made by the defendant. At the suggestion of the prosecutor the trial court conducted a *Jackson v. Denno* hearing outside the presence of the jury. Detective Oakley testified substantially in the manner discussed above. In the police car outside the defendant's home Oakley asked the defendant the questions set forth above and ceased questioning the defendant at the point where the defendant admitted having seen a bullet hole in Mendoza's head. Oakley testified that before any interrogation was conducted at the police station, he fully advised defendant of his constitutional rights and that the defendant signed the *Miranda* form indicating that he understood those rights. It was his testimony that defendant's statement was voluntarily made without force or coercion. According to Oakley the defendant was not nervous or crying during interrogation. He did not request an attorney and Oakley did not remember him asking to call his

mother. Oakley said at no time did the defendant state that he did not want to talk.

The defendant also testified at the *Jackson v. Denno* hearing. He stated that at the police station he did not fully understand his rights at the time of the questioning or at the time of the hearing. He acknowledged the presence of his initials on the *Miranda* warning but stated that he wanted to call his mother so she could get him a lawyer. According to the defendant he was told that she was being called. He stated that he was scared throughout the questioning and did not know that he had a right to stop answering questions. The defendant did not dispute Oakley's version of what occurred in the police car before defendant was taken to the police station.

Oakley and the defendant were the only witnesses to testify during the *Jackson v. Denno* hearing. The trial court then ruled as follows:

". . . the Court finds that all statements given prior to the Wichita Police Department were voluntary statements. The defendant was in custody. The testimony is when he made this one particular statement about which Oakley testified at that time that Detective Oakley made the . . . subjective judgment that the defendant was not free to leave, that his rights to come and go were substantially impaired at that time. Although Detective Oakley did not technically place him under arrest, I think he recognized for all practical purposes the defendant was under arrest. It was only at that point that the state had the obligation to advise the defendant of his rights.

"There may have been statements made between that time and the time the defendant was advised of his rights. There may not have been. It doesn't make much difference because they haven't been offered by the State. He indicated that he understood his rights. He read them out loud. I don't know what more the police could have done in this respect as far as advising the defendant of his rights.

"He was properly advised according to Miranda vs. Arizona and understood these rights. He waived those rights, he voluntarily, knowingly, understandingly and intelligently gave a voluntary statement to the Police Department. The statements are admissible."

Following this hearing Detective Oakley took the stand and testified before the jury. His testimony was essentially as set forth above. The defendant told him three different versions about his actions on the morning of the homicide each time placing the defendant a little further into the apartment. Following the presentation of Oakley's testimony as to the defendant's statements, the state rested. The defendant then took the stand in his own behalf. He testified that he had been driven by Wayne Woods to Men-

doza's house where Mendoza pulled a pistol on him; that he had wrestled the pistol from Mendoza's hand; that Mendoza came at him with a hot iron; that the defendant pushed Mendoza back several times and finally that he fired the gun "to stop the fighting" and because he was "scared" but he did not intend to shoot Mendoza. In rebuttal the state recalled to the stand Darrell Oakley who identified the defendant's taped statement taken by Oakley at the police station. This statement was admitted into evidence over the objection of defense counsel. Both of the parties then rested. The evidence at the trial raised a bona fide issue as to self-defense and the defendant's intent at the time he shot Mendoza. The jury found the defendant guilty of second-degree murder and not guilty of aggravated robbery. Following his conviction, the defendant appealed to this court.

The sole point raised by the defendant on this appeal is that the trial court erred in admitting the testimony of Detective Oakley and the taped statement of the defendant both of which contained defendant's admissions that it was he who shot Arthur Mendoza and incriminating circumstances surrounding the killing. In substance the defendant contends that his incriminating statements were inadmissible for two reasons: (1) The oral statement taken in the police car by Detective Oakley was taken in violation of the *Miranda* rule since admittedly defendant was not advised of his constitutional rights, and (2) Considering the totality of the circumstances, defendant's statements taken at the police station were made involuntarily and were not the product of a free and independent will.

We must first consider the admissibility of defendant's incriminating oral statements made in response to questioning by Detective Oakley in the police car in front of the defendant's home. It is undisputed that the police officers did not give to defendant the *Miranda* warnings in the police car. The *Miranda* warnings are required where there is a custodial interrogation of the defendant by police officers. It is the position of the state that there was no custodial interrogation of the defendant and hence the *Miranda* warnings were not required. Because of the difficulty of formulating a precise definition of "custodial interrogation" the courts have taken a "case-by-case" approach to resolving questions of custodial interrogation. (*United States v. Akin,* [C. A. 5th, 1970] 435 F. 2d 1011.) The particular factual circumstances in each case are therefore of the upmost importance.

In *Miranda* the Supreme Court of the United States defined "custodial interrogation" in the following language:

". . . By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. . . ." (p. 444.)

*Miranda* recognized, however, that general on-the-scene questioning as to facts surrounding a crime *or other general questioning of citizens in the fact finding process* does not constitute custodial interrogation requiring a *Miranda* warning. The question of where to draw the line has caused great concern for courts and commentators in the post-*Miranda* era. In 31 A. L. R. 3d 565 there is a comprehensive annotation on the subject entitled "What Constitutes 'Custodial Interrogation' Within Rule of Miranda v Arizona Requiring That Suspect Be Informed of his Federal Constitutional Rights Before Custodial Interrogation". Some cases in the various jurisdictions are not in agreement even where the factual circumstances are quite similar. We note several cases where the factual circumstances were comparable to those presented in this case and the appellate court held there was no custodial interrogation and hence the defendant's statement to police officers was admissible. (*State v. Bower,* 73 Wash. 2d 634, 440 P. 2d 167; *State v. Caha,* 184 Neb. 70, 165 N. W. 2d 362; and *United States v. Akin,* supra.)

Since *Miranda* this court has developed a number of general guidelines to be applied in determining whether or not a custodial interrogation has taken place. In *State v. Brunner,* 211 Kan. 596, 507 P. 2d 233, we held that a person who has not been arrested is not in police custody unless there are *significant* restraints on his freedom of movement which are imposed by some law enforcement agency. We have also declared that a general questioning of citizens in the course of an investigation in the fact finding process does not constitute custodial interrogation. We defined an investigatory interrogation as the questioning of persons by law enforcement officers in a routine manner in an investigation which has not reached an accusatory stage and where such persons are not in legal custody or deprived of their freedom of action in any significant way. (*State v. Frizzell,* 207 Kan. 393, 485 P. 2d 160.) In *State v. Carson,* 216 Kan. 711, 533 P. 2d 1342, Syl. 5, we suggested that circumstances bearing on whether a person questioned was subjected to "custodial interrogation" requiring *Miranda* warnings can be classified under the following general headings: (1) The nature of the interrogator; (2) the nature of the suspect; (3)

the time and place of the interrogation; (4) the nature of the interrogation; and (5) the progress of the investigation at the time of interrogation. In *Carson* we also stated that the fact a suspect is the focus of an investigation, standing alone, does not trigger the need for a *Miranda* warning but it may be one of the determinative factors in arriving at a decision whether such a warning is needed.

In analyzing the factual circumstances presented in the case before us, we have concluded that the defendant was not entitled to a *Miranda* warning at the time he was questioned by Detective Oakley in the police car because he was not "in custody" at the time he was questioned. At this time the investigation was of a general nature. No warrant existed for defendant's arrest and no charge had been made against him or anybody else. The detectives approached defendant on his front porch, identified themselves, told him the purpose of their inquiry, and then asked him to sit with them in the police car to which suggestion the defendant readily agreed. At that time the detectives knew only that the defendant had been at Mendoza's apartment within the previous 24 hours. Detective Oakley knew that Mendoza had been shot in the back of the head and that during the morning of the homicide an unknown black male was observed in the vicinity of Mendoza's apartment and had departed from the area in a red automobile. It was the hope of Detective Oakley that the defendant might give them some information which would lead to the identity of the owner of the red automobile and the identification of the black male who was observed in the area. When the defendant made statements which raised a suspicion that he was present at the time Mendoza was shot, the detective immediately stopped further interrogation and took the defendant into custody. There is nothing in the evidence to show that prior to that time there was any restraint, let alone "significant restraint". It appears that the defendant was free to go at any time. There is no evidence that the detective used force to compel defendant to sit in the police car nor that any promises or threats were made to induce defendant to give any information. In view of the absence of any evidence to support a finding of custodial interrogation, and the early stage of investigation at which the questioning of defendant occurred, we have concluded that these facts fail to establish that a custodial situation existed and therefore the *Miranda* warnings

were not required during the questioning in the police car. Hence defendant's oral statements made in the police car were admissible.

The defendant next maintains that his constitutional rights were violated by the trial court's admitting into evidence his statements made at the police station. Here the trial court conducted a full evidentiary hearing to determine whether the requirements of *Miranda* were complied with and further to determine whether or not the appellant knowingly, voluntarily, and intelligently waived his rights and made his statements voluntarily without promise or coercion. We have examined the entire record and have concluded that there is substantial competent evidence to support findings of the trial court that the defendant after being given proper *Miranda* warnings voluntarily, knowingly, and intelligently waived his Fifth and Sixth Amendment rights. It is clear that the trial court did everything required of it in conducting the *Jackson v. Denno* hearing. Since there was some conflict between the testimony of Detective Oakley and that of the defendant, it was the duty of the trial court to weigh such conflicting evidence and make its findings based on the totality of the circumstances disclosed. Here there is evidence to show that the defendant read and voluntarily signed the waiver of rights form and that there were no threats or coercion by the police officers. Although defendant did not initially understand the term "coercion", it was adequately explained to him by Detective Oakley. The period of questioning was not extremely lengthy. Furthermore the defendant testified in his own behalf at the trial and the statements which he gave at the police station were substantially in conformity with his testimony. Under all of the circumstances we find that the trial court did not err in admitting into evidence the statements given by defendant to the police officer at the police station.

For the reasons set forth above the judgment of the district court is affirmed.