No. 48,797

STATE OF KANSAS, *Appellee,* v. NOBLE LeROY JOHNSON, *Appellant.*

(573 P.2d 994)

Opinion filed December 10, 1977.

*Robert M. Green,* of El Dorado, argued the cause and was on the brief for appellant.

*Geary Gorup,* county attorney, argued the cause and *Curt T. Schneider,* attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

HOLMES, J.: This is an appeal by defendant-appellant from a jury trial convicting defendant of two counts of murder in the first degree. (K.S.A. 21-3401.)

On Saturday, September 6, 1975, a double murder was committed in El Dorado. The murdered persons were Thomas Woodyard and Darlene Beech Woodyard. The bodies, found by the landlady on Tuesday evening, September 9, 1975, were horribly mutilated and it would serve no useful purpose to describe them further.

Noble Leroy Johnson, the defendant, and Linda Johnson, his wife, were close friends of the deceased couple. On that fateful Saturday night the two families dined together at the Johnson house. During the police investigation the Johnsons were questioned and asserted they had not seen the Woodyards since Saturday evening. Noble Johnson also stated he had not been to the Woodyard house since Saturday except early Monday morning to pick up Tom Woodyard to go to work, but that no one was home.

On Wednesday, September 10, 1975, autopsies were performed, which indicated the time of death to be a few hours after the victims' last meal at the Johnson residence Saturday night. On Wednesday evening, a Wichita man, Phillip Pless, was watching

area television news reports of the murders when he recognized the Woodyard home. Pless contacted the Wichita Police Department and told police that while making deliveries in the El Dorado area he stopped at the Woodyard residence at approximately ten o'clock a.m. Tuesday, September 9, 1975. Pless advised that he knocked on the door but got no response although he heard noises inside the house. As Pless left the residence to continue his deliveries, he observed a man crouching down behind the Woodyard residence. From a display of several photographs, Pless identified Noble Leroy Johnson as the man he observed behind the Woodyard residence on Tuesday morning.

Noble Leroy Johnson and his wife were found at different locations by law enforcement officers on Thursday morning, September 11, 1975, and taken to the police station for questioning. They were transported in different cars and questioned individually in separate areas of the building. Linda Johnson gave a detailed oral statement, regarding the events of Saturday evening and the days thereafter, which directly implicated her husband in the two killings.

While Linda Johnson was talking with law enforcement officers in one area of the building, her husband was being questioned in a different area of the building. Noble Johnson was given the *Miranda* warnings prior to questioning by the officers. He indicated that he understood his rights, and that he wished to waive those rights and talk with the officers. His statements, however, did not constitute an admission of guilt. During questioning the defendant asked if he could talk to his preacher, Lyle Curtis. Questioning was suspended; Pastor Curtis was contacted and came to the police station where questioning was resumed with Pastor Curtis remaining in attendance. At the direction of the county attorney, the interrogating officers attempted to explain the provisions of the Kansas law on marital privilege. The officers and Pastor Curtis later testified that in their opinion defendant was made aware of the marital privilege and that he knowingly consented to the officers questioning Linda. It is the state's contention that at this point defendant waived his right to assert the marital privilege. A sworn statement was then taken from Linda Johnson in another part of the building.

Defendant was arrested and appeared before a magistrate, and counsel was appointed that same day. Defendant remained in

custody and, while incarcerated, Undersheriff John Fee culti-
vated his friendship and had several conversations with him. On
September 19, 1975, during one of these conversations John Fee
advised defendant of his *Miranda* rights and asked him to relate
what had happened the night of Saturday, September 6, 1975. No
attempt was made by Fee to contact defendant's counsel. At this
time defendant gave John Fee an oral statement describing his
version of the events of that Saturday night. The statement placed
defendant at the scene of the murders and was exculpatory as to
the homicide of the female victim and indicated some sort of
justifiable homicide as to the male victim.

Defense counsel filed a claim of marital privilege to prevent the
testimony of Linda Johnson, and a motion to suppress the state-
ments made by the defendant. At a *Jackson v. Denno* type hear-
ing, the claim of marital privilege and motion to suppress the
defendant's statements were denied. Defendant filed notice of his
intent to rely on a defense of not guilty by reason of insanity. At
the direction of the court, defendant was examined by James R.
Leach, D.O., and B. E. White, M.D., and found competent to
stand trial. Defendant was convicted by a jury of murder in the
first degree on both counts and sentenced to two consecutive life
terms. Appropriate motions were made during trial objecting to
the admission of testimony of Linda Johnson and testimony by
the officers relating their conversations with the defendant. Upon
denial of defendant's motion for a new trial, he appeals to this
court.

Defendant alleges four points of error on appeal:

"1.  That upon the conclusion of the evidence the Jury should have been
directed to return a verdict of not guilty by reason of insanity of the defendant.

"2.  That it was error to admit testimony of the defendant's wife, Linda
Johnson. That said communications were privileged communications, which
privilege could not be waived by an insane person.

"3.  That it was error to admit testimony of John Fee, Undersheriff, to state-
ments made by the defendant. That at the time of the making of said statements
the defendant was insane, was not represented by counsel and could not know-
ingly waive the right to have counsel present by reason of his insanity.

"4.  That the defendant did not waive the marital privilege to allow his wife to
testify against him and it was error to admit her testimony."

Defendant in his first point on appeal insists the Court should
have directed the jury to return a verdict of not guilty by reason of
insanity. Defendant introduced extensive evidence in support of

his defense of insanity including his own testimony, which covers some seventy pages of the transcript. His testimony and actions in court were, to say the least, bizarre in many respects and certainly could lead one to the conclusion that defendant was mentally ill, if not legally insane. Defendant's mother, father and other family members testified to his strange behavior almost from the time of birth. Steve Shelton, M.D., a psychiatrist, who had examined the defendant at the request of the State, was called as a witness for the defendant. His opinion was that defendant was potentially violent and dangerous, was psychotic on the night of the murders and at the time of the murders was not capable of distinguishing right from wrong.

The state presented evidence in rebuttal to sustain its position that defendant was not legally insane at the time of the murders. Included was the testimony of Dr. James R. Leach, Clinical Director and Psychiatrist at the South Central Mental Health Center in Butler County. Dr. Leach diagnosed the defendant as being an "explosive, antisocial personality," suffering from a number of personality disorders but felt that defendant knew the difference between right and wrong at the time of the murders.

In addition to direct evidence to refute the defense of insanity there was other testimony indicating defendant's awareness of the nature of his acts. Mrs. Johnson testified that when defendant returned home from the Woodyard residence on Saturday night he made her wash the blood from his boots and clothes, stated to her, "God will never forgive me for what I did tonight," and went to great lengths to conceal the crime. Statements by the defendant to police officers and John Fee indicated he knew what he had done was wrong and that he knew so at the time of the murders.

The test in Kansas for determining the criminal responsibility for committing a crime is the *M'Naghten* test; that is, whether the accused was capable of distinguishing between right and wrong at the time of the commission of the crime. *M'Naghten* has long been the rule in Kansas and was reconsidered and adhered to this day in *State v. Smith,* 223 Kan. 203, 574 P.2d 548.

Whether a defendant in a criminal action was sane or insane at the time of the commission of the offense with which he stands charged is to be determined by the jury, under proper instructions from the court, upon the evidence introduced bearing upon such issue. *State v. Coltharp,* 199 Kan. 598, Syl. 1, 433 P.2d 418.

In view of the conflicting evidence before the court, reasonable minds might differ as to the sanity or insanity of the defendant and there was no error in the trial court's refusal to direct the jury to return a verdict of not guilty by reason of insanity.

In defendant's second and fourth points on appeal, he contends it was error to admit the testimony of his wife, Linda Johnson, because (1) an insane person (the defendant) cannot waive the marital privilege and (2) defendant did not, in fact, waive the privilege. In the third point on appeal defendant alleges error in allowing John Fee, Undersheriff, to testify as to defendant's statements made at a time when defendant (1) was insane and (2) did not have counsel present.

These arguments were considered together by the trial court at a hearing on defendant's notice of claim of marital privilege and motion to suppress his statements to officers.

Defendant had been examined by two doctors appointed by the court to determine his competency to stand trial and both concluded that he was competent to stand trial. In view of their examinations, and the jury's verdict, we see no reason to extend this opinion on this particular point and find no error by the trial court in determining there was sufficient evidence of defendant's sanity at the time of the alleged waiver of the marital privilege and the giving of statements by defendant, and that such was done knowingly and voluntarily. See *State v. Thompson and Pennington,* 221 Kan. 165, 558 P.2d 1079.

However, this does not conclude the matter as defendant further contends that; if sane, he did not, in fact, waive his right to assert the marital privilege. He also contends his statement to John Fee was inadmissible because his counsel was not notified and given an opportunity to be present.

During the initial interrogation of defendant the police officers, at the direction of the county attorney, explained the marital privilege to defendant and asked if they could take a statement from Mrs. Johnson. Defendant's pastor was present and the officers and Pastor Curtis testified defendant understood the privilege. Defendant responded to the effect that if his wife wanted to give a statement it was all right with him; she wouldn't lie; whatever she said would be true and it was up to her. The sworn statement of Linda Johnson was taken at that time and later

she was allowed to testify, over defendant's objections, at the trial. Her statement and testimony included things defendant told her the night of the murders and subsequent thereto and were extremely damaging to defendant.

While in custody and on September 19, 1975, John Fee read defendant his *Miranda* rights and then obtained his oral statement. Included in the oral statement were a number of things that defendant had told his wife and which were claimed by defendant to be privileged communications with Mrs. Johnson. The trial court found defendant had knowingly and understandably waived his right to assert the marital privilege by voluntarily disclosing much of the conversation claimed to be privileged to a third person (Fee).

Our statutes provide that what might otherwise be a confidential communication may be waived.

K.S.A. 60-437 provides in part:

"A person who would otherwise have a privilege to refuse to disclose or to prevent another from disclosing a specified matter has no such privilege with respect to that matter if the judge finds that such person or any other person while the holder of the privilege has  .  .  . (*b*) without coercion, or without any trickery, deception, or fraud practiced against him or her, and with knowledge of the privilege, made disclosure of any part of the matter or consented to such a disclosure made by anyone."

Gard, in his work on the Code of Civil Procedure, states:

"Clause (b) requires that the waiver which results from prior disclosure must be voluntary and not obtained through ignorance of the privilege or through coercion or fraud. But if a privilege is waived as to a part of the subject matter, so that it has lost its confidential character, the waiver must, in justice, apply to the whole of the matter. No picking and choosing is permitted." Gard, *Kansas Code of Civil Procedure,* Sec. 437, pp. 426-427 (1963).

We find no error on the part of the trial court in its determination that defendant had waived his right to assert the marital privilege.

Defendant's final argument is that John Fee should not have been allowed to testify as to the statements made to him by defendant at a time when defendant had counsel unless such counsel was present when the statement was elicited.

The record is clear that John Fee knew the defendant was represented by counsel, knew counsel was readily available and made no attempt to notify counsel that his client was about to make a statement. Defendant's counsel urges this court to adopt the rule that when defendant is represented by counsel no statement may be taken without counsel being present.

The Tenth Circuit has condemned the practice of agents conferring with a prisoner, even with his consent, and taking a statement from him after counsel had been assigned or in his absence. It was pointed out, however, that the practice did not necessarily involve a constitutional issue but rather a violation of the canons of ethics, which did not require reversal of defendant's conviction.

"What we do hold, however, is that once a criminal defendant has either retained an attorney or had an attorney appointed for him by the court, any statement obtained by interview from such defendant may not be offered in evidence for any purpose unless the accused's attorney was notified of the interview which produced the statement and was given a reasonable opportunity to be present. To hold otherwise, we think, would be to overlook conduct which violated both the letter and the spirit of the canons of ethics. This is obviously not something which the defendant alone can waive.

"A violation of the canon of ethics as here concerned need not be remedied by a reversal of the case wherein it is violated. This does not necessarily present a constitutional question, but this is an ethical and administrative one relating to attorneys practicing before the United States courts. . . ." *United States v. Thomas,* 474 F.2d 110, 112 (10th Cir. 1973), *cert. den.* 412 U.S. 932, 37 L.Ed.2d 160, 93 S.Ct. 2758 (1973).

This court has held, under somewhat different circumstances, that failure to have counsel present does not "ipso facto" make a defendant's statement involuntary. *State v. Creekmore,* 208 Kan. 933, 934, 495 P.2d 96 (1972). See also *State v. Melton,* 207 Kan. 700, 486 P.2d 1361 (1971).

"An accused may effectively waive the right to have counsel present during any police interrogation. The fact that he has previously retained counsel does not necessarily make inadmissible a voluntary statement made by the defendant in his counsel's absence." *State v. Taylor,* 217 Kan. 706, Syl. 5, 538 P.2d 1375.

The trial court, after appropriate protective hearings, found that defendant's statement to John Fee was "freely, voluntarily, understandably and knowingly made."

The trial court, in this case, went to extreme lengths to protect defendant's rights. The issues presented in this appeal were explored at length in pretrial hearings, during trial and at the motion for a new trial. We do not find any abuse of discretion or error by the trial court in its various rulings on the points presented.

The judgment of the trial court is affirmed.