No. 51,410

STATE OF KANSAS, *Appellee,* v. JOHN COSTA, JR., *Appellant.*

(613 P.2d 1359)

Opinion filed July 18, 1980.

*Lee Hornbaker,* of Harper & Hornbaker, Chartered, of Junction City, argued the cause and was on the brief for the appellant.

*Wm. Rex Lorson,* county attorney, argued the cause, and *Robert T. Stephan,* attorney general, was with him on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, C.J.: This is an appeal in a criminal action from a jury verdict finding John Costa, Jr., (defendant-appellant) guilty

of felony murder (K.S.A. 21-3401), attempted kidnapping (K.S.A. 21-3301; K.S.A. 21-3420), and attempted rape (K.S.A. 21-3301, K.S.A. 1979 Supp. 21-3502). The appellant asserts six issues on appeal.

Marilyn Butcher, a young girl from Abilene, Kansas, left work at Zale's Jewelers in the Mid-State Mall in Salina between 6:30 and 6:45 p.m. on the evening of Saturday, January 6, 1979, apparently heading for home.

At 7:00 p.m., William Stoddard, a truck driver with a regular Kansas City to Liberal route, drove his Navajo truck into the south rest area on I-70 near Solomon, Kansas. As Stoddard drove into the area he observed a blue car, similar to a car later identified as Marilyn Butcher's car, parked in the area for automobiles; he observed a truck in the truck lane. Stoddard parked his truck, exited and stretched his legs, and went into the restroom. When Stoddard returned from the restroom he noticed a second tractor-trailer had pulled in. As Stoddard crossed the median heading back to his truck he saw a man who was walking toward the restroom; they chit-chatted awhile. Stoddard identified the appellant as the man he spoke with that night in the rest area. Stoddard observed no one else in the rest area; he worked on his log book and left the area about 7:15 p.m.

Around 8:00 p.m., James Joyner, and his co-driver, Bobby Joe Kemp, pulled their tractor-trailer into the south Solomon rest area. Joyner observed a tractor-trailer rig parked in the truck lane and a blue car parked near the restroom. Joyner pulled his truck in directly behind the other truck. Joyner testified he saw some movement; something like an arm or a leg, tan in color. It appeared to Joyner that someone was getting in or out of the cab of the truck. The truck started to move just as Joyner stopped his truck. Joyner observed the truck rock back and forth, and from side-to-side. He saw a body on the ground and realized the front tandem wheels of the trailer had just run over the body. Joyner screamed, and Kemp, who had started to get out of their truck, turned and looked. Both men saw the back tandem wheels of the trailer pass directly over the body. The two men got a good look at the rear of the trailer pulling out and later gave the highway patrol a description of the trailer. Joyner ran over to the body, then went back to his truck and used the CB radio to call the departing truck driver. Joyner told the departing truck driver that he had run over

the co-driver. An answer came back, "Oh, no, man I couldn't have. He's back here in the sleeper." Joyner responded, saying, "No, he's not. He's back here laying here on the ground." The departing driver then said, "Well, I'll go up to the 76 [truck stop] up here and turn around and come back." The truck and driver did not return. Joyner and Kemp later identified the appellant's truck as the one they saw at the rest area.

The Kansas Highway Patrol was called and Trooper Ricky Lee Affholder soon arrived at the rest area. After obtaining a description of the truck, Trooper Affholder conveyed the description to the Kansas Highway Patrol dispatcher. A message was sent to area troopers to stop the truck. This message was received by Troopers William Kelley, Jerry Downie, and William McShane of the Kansas Highway Patrol, near Junction City, Kansas, at 8:20 p.m. At 8:36 p.m. Troopers McShane and Kelley stopped a tractor-trailer fitting the description, near Junction City. The appellant was driving the truck. The appellant exited his truck and was asked if he had been at the Solomon rest area. The appellant replied that he had been at the Solomon rest area about 30 minutes earlier. Trooper Kelley advised the appellant that his truck met the description of the one which was involved in an accident, and that he would have to wait until the troopers received further word on it. A few minutes later the troopers were advised by radio that the death might be a homicide, because the hands of the decedent were apparently tied behind her back. The appellant was then frisked, given the *Miranda* warnings, and was again asked if he had been at the Solomon rest area. The appellant again replied that he had been at the rest area about 30 minutes before he was stopped. Later that night the appellant was taken to the Geary County jail in Junction City, Kansas.

Examination of Marilyn Butcher's body showed that in addition to her hands being tied behind her back, her pants were unzipped, and her shoes and one stocking were gone. Tire marks on her body indicated that dual wheels had passed over her head and down the length of her body. The cause of death was established as being run over by a truck. Her shoes were later found near the exit from the rest area on to the highway. Her purse and one stocking were found in a culvert about five miles east of the rest area; her coat was found almost another mile farther down the road. Laboratory examination disclosed several

spots of seminal fluid on the crotch of her slacks, as well as on a sleeping bag found in the sleeper of the appellant's truck.

Agent William Tucker of the Kansas Bureau of Investigation testified that the tire impressions left in the ice at the rest area, and the tire marks left on Marilyn Butcher's body, were caused by tires which were exactly the same or similar to those found on the appellant's truck. Human blood was located on one of the right rear tires of the appellant's truck.

On the morning of January 8, while being held in custody at the Saline County jail, appellant told the jailer that he would like to talk to Captain Richard Hurley of the Saline County Sheriff's office. Captain Hurley took the appellant to his office where he had been talking to KBI agent Lanny Grosland. Grosland advised the appellant of his *Miranda* rights, and had the appellant read and sign a waiver of those rights.

The appellant told Hurley and Grosland that he had been traveling with three Monfort trucks and had stopped at the Solomon rest area to get a drink; when he found that the faucet was frozen, he worked on his log book about fifteen minutes. While the appellant was there, he saw an unknown car, a Navajo truck, and a small car driven by an elderly gentleman. The appellant told the officers he then left and went to the Union 76 Truck Stop where he joined up with the three Monfort trucks he was traveling with when he was stopped by the Kansas Highway Patrol.

The appellant was charged with attempted rape, attempted kidnapping, and felony murder. He was tried and convicted on all three counts. Appeal has been duly perfected.

The appellant first contends his constitutional rights were violated when he was interrogated by Kansas Highway Patrol troopers at the time he was stopped and before he was given the *Miranda* warnings. According to the appellant he was subjected to custodial interrogation; the State claims it was investigatory interrogation.

We have defined custodial interrogation as the questioning of a person by law enforcement officers which is initiated and conducted while such person is held in legal custody or is otherwise deprived of his freedom of action in any significant way. *State v. Frizzell,* 207 Kan. 393, Syl. ¶ 1, 485 P.2d 160 (1971). A person who has not been arrested is not in police custody unless there are

significant restraints on his freedom of movement which are imposed by some law enforcement agency. *State v. Bohanan,* 220 Kan. 121, Syl. ¶ 2, 551 P.2d 828 (1976). Investigatory interrogation is the questioning of a person by law enforcement officers in a routine manner in an investigation which has not reached an accusatory stage and where such person is not in legal custody or deprived of his freedom of action in any significant way. *State v. Edwards,* 224 Kan. 266, 268-69, 579 P.2d 1209 (1978); *State v. Bohanan,* 220 Kan. at 128; *State v. Frizzell,* 207 Kan. 393, Syl. ¶ 2.

Circumstances bearing on whether a person questioned was subjected to "custodial interrogation" requiring *Miranda* warnings can be classified under the following general headings: (1) The nature of the interrogator; (2) the nature of the suspect; (3) the time and place of the interrogation; (4) the nature of the interrogation; and (5) the progress of the investigation at the time of interrogation. *State v. Edwards,* 224 Kan. at 269; *State v. Bohanan,* 220 Kan. at 128-29; *State v. Carson,* 216 Kan. 711, 715, 533 P.2d 1342 (1975); Annot., 31 A.L.R.3d 565. The fact a suspect is the focus of an investigation, standing alone, does not trigger the need for a *Miranda* warning, but it may be one of the determinative factors in arriving at a decision whether such a warning is needed. *State v. Edwards,* 224 Kan. at 269; *State v. Bohanan,* 220 Kan. at 129; *State v. Carson,* 216 Kan. at 715.

Applying these guidelines to the facts of this case, we are satisfied no custodial interrogation occurred when the appellant was initially questioned by the highway patrol troopers.

(1) The nature of the interrogator. Trooper Kelley was the interrogator. Moments earlier Kelley had received information regarding an accident at the Solomon rest area. Kelley was one among several troopers who received the information and conducted the search for the described truck.

(2) The nature of the suspect. Many trucks were stopped that evening in the area-wide search. The appellant was one suspect because his truck fit the description.

(3) The time and place of the interrogation. The troopers received the description of the suspect truck at 8:20 p.m. The appellant was stopped 27 miles from the rest area at 8:36 p.m.

(4) The nature of the interrogation. Kelley asked the appellant logical, general questions in the fact-finding process. From the record it appears the troopers conducted themselves in a busi-

ness-like, yet friendly manner. There is nothing to suggest a coercive atmosphere surrounded the interrogation. Kelley asked the appellant if he had been at the Solomon rest area. When the appellant said yes, Kelley told the appellant his truck matched the description of one involved in an accident. Kelley then told the appellant he would have to wait until they received further information on the accident. Kelley returned to his patrol car, where Trooper McShane was monitoring the radio. Trooper Downie remained with the appellant and engaged in small talk.

(5) The progress of the investigation at the time of interrogation. When the troopers stopped the appellant's truck there had been no determination that a crime had been committed. The troopers were investigating a truck-pedestrian fatality. The troopers had no license number for the truck. They had a general description of the trailer—that it was a box-type trailer with the words "Pan American, or something to that effect, written on it." *After* Trooper Kelley returned to his patrol car, the nature of the investigation changed. Kelley and McShane received the information that the victim's hands were tied behind her back. They were instructed to treat the case as a suspected homicide. Immediately upon receiving this information, Trooper McShane left the patrol car, frisked and handcuffed the appellant, and read him the *Miranda* warnings.

Although the appellant was the "focus" of the investigation by Troopers Kelley, McShane and Downie, there is an absence of evidence to support a finding of custodial interrogation. *State v. Brunner,* 211 Kan. 596, 599, 507 P.2d 233 (1973). The investigation was in its infancy; approximately twenty minutes had transpired between the time the troopers received the bulletin and stopped the appellant. There was no significant restraint of the appellant during the questioning; he was not under arrest. The facts clearly indicate that when the investigation reached an accusatory stage, the appellant was placed in custody and given the *Miranda* warnings. Absent proof of a custodial interrogation, the *Miranda* warnings were not required before the initial general questioning. Hence the appellant's statement that he had been at the Solomon rest area 30 minutes earlier was admissible.

The appellant contends it was error for the trial court to admit into evidence statements he made to officers in the Saline County jail when the officers knew the appellant was represented by counsel, and counsel was not present.

On January 7, 1979, Lee Hornbaker, Junction City, Kansas, was retained to represent the appellant. Hornbaker visited with the appellant and with Captain Hurley at the Geary County jail the same day. Captain Hurley knew Hornbaker was the appellant's attorney. On January 8, 1979, the appellant was being held at the Saline County jail, and asked to speak with Captain Hurley. The appellant was advised of his constitutional rights, including the right to counsel, and signed a written waiver. The appellant then made a generally exculpatory statement. The statement proved to be damaging in that it corroborated William Stoddard's testimony. Captain Hurley testified the appellant cried for a few minutes, but was in control of his emotions.

An accused may effectively waive the right to have counsel present during any police interrogation. The fact that he has previously retained counsel does not necessarily make inadmissible a voluntary statement made by the defendant in his counsel's absence. *State v. Johnson,* 223 Kan. 237, 243, 573 P.2d 994 (1977); *State v. Taylor,* 217 Kan. 706, Syl. ¶ 5, 538 P.2d 1375 (1975); see *State v. Jones,* 220 Kan. 136, 138-39, 551 P.2d 801 (1976).

The appellant does not contend the statement was involuntary, only that it was made without the presence of counsel. The trial court conducted an evidentiary hearing and found the appellant had waived his right to have counsel present. The record discloses substantial competent evidence to support the trial court's finding. *State v. Porter,* 223 Kan. 114, 118, 574 P.2d 187 (1977). The trial court did not commit error in admitting the appellant's statement into evidence at trial.

The appellant contends the trial court committed error in failing to dismiss the complaint, and in permitting late endorsement of witnesses on the complaint and the information.

The original complaint was filed on January 8, 1979; no witnesses were endorsed on the complaint. On January 17, 1979, the appellant filed a motion to dismiss the complaint because it listed no witnesses. The State filed an amended complaint on February 2, 1979, listing nineteen witnesses. At the preliminary hearing on February 5, 1979, the court denied the appellant's motion to dismiss and accepted the State's amended complaint. On February 16, 1979, the State filed its information listing 75 witnesses.

K.S.A. 1979 Supp. 22-3201(6) governs endorsement of witnesses on the complaint or information. That statute states:

"The prosecuting attorney shall endorse the names of all witnesses known to said attorney upon the complaint, information and indictment at the time of filing the same. Said attorney may endorse thereon names of other witnesses as may afterward become known to said attorney, at such times as the court may by rule or otherwise prescribe."

This court has repeatedly held that the endorsement of *additional* witnesses on an information is a matter of judicial discretion and will not be the basis for reversal absent proof of an abuse of discretion. The test of the exercise of that discretion is whether or not the rights of the defendant were unfairly prejudiced by the endorsement. See *State v. Prince,* 227 Kan. 137, 145, 605 P.2d 563 (1980); *State v. Taylor,* 217 Kan. 706, Syl. ¶ 6.

The appellant contends the word "shall" in 22-3201(6) is a mandatory requirement that the prosecutor endorse all known witnesses on the original complaint. In support of his argument the appellant recites the inconclusive interpretation of the prior statute, G.S. 1949, 62-802, and the fact the word "shall" in 22-3201(6) is an addition to the previous statutory wording. We do not agree with the appellant in his construction of the statute. In our view the statutory provision is directory rather than mandatory since it simply directs a mode of procedure to secure order, system, and dispatch in criminal proceedings. *State v. Turner,* 223 Kan. 707, 708, 576 P.2d 644 (1978); *Paul v. City of Manhattan,* 212 Kan. 381, 511 P.2d 244 (1973); *State v. Brown,* 205 Kan. 457, 470 P.2d 815 (1970); see *Bell v. City of Topeka,* 220 Kan. 405, 553 P.2d 331 (1976).

The purpose of the endorsement requirement is to prevent surprise to the defendant and to give him an opportunity to interview and examine the witnesses for the prosecution in advance of trial. *State v. Bryant,* 227 Kan. 385, 387, 607 P.2d 66 (1980).

It is not error *per se* when the prosecutor fails to endorse the names of all known witnesses on the original complaint. However, it bears repeating this court will not condone surprise caused by the intentional withholding of the name of a witness as a part of the prosecution's trial strategy. *State v. Bryant,* 227 Kan. at 387; *State v. Stafford,* 213 Kan. 152, 164, 515 P.2d 769 (1973), *modified* 213 Kan. 585, 518 P.2d 136 (1974).

The appellant has made no claim of prejudice or surprise. The appellant was notified of the names of nineteen of the State's witnesses when the amended complaint was filed on February 2, 1979. The appellant had learned the names of 75 potential State's witnesses when the information was filed on February 16, 1979, and their names were endorsed on the information. Trial did not commence until May 7, 1979. The appellant did not contend at the time of trial he was unprepared to proceed or needed additional time.

The appellant also contends in relation to 22-3201(6) that the trial court erred in permitting the late endorsement of the additional witness, William Stoddard. On the day of trial, the State requested and the trial court granted leave to endorse Stoddard. Stoddard was a material witness and his testimony helped establish the State's case that the appellant was at the rest area when the death occurred. *Appellant's counsel* had located and interviewed Stoddard a few days prior to trial. The State thereafter located and interviewed Stoddard. Although the appellant objected to the late endorsement, he did not request a continuance. See *State v. White & Stewart,* 225 Kan. 87, 91, 587 P.2d 1259 (1978); *State v. Rueckert,* 221 Kan. 727, 561 P.2d 850 (1977); *State v. Wilson & Wentworth,* 221 Kan. 359, 364, 559 P.2d 374 (1977). Absent proof of prejudice to the appellant's rights we cannot say the trial court abused the exercise of its power of discretion in permitting the late endorsement of witness Stoddard. The appellant's counsel knew about Stoddard, interviewed him, and even contemplated calling him as a witness.

The appellant contends the trial court erred in denying a request for a continuance and in determining the appellant was competent to stand trial. The appellant does not allege or present evidence showing he was incompetent to stand trial. Instead, the appellant contends the trial court did not follow the proper procedure before finding the appellant was competent to stand trial.

On April 6, 1979, the appellant's counsel requested that the court permit the appellant to be examined by a psychiatrist to determine competency to stand trial. Two qualified physicians were selected by the appellant's counsel to examine the appellant. On May 4, 1979, the appellant's counsel requested a continuance because the written reports and evaluations had not been received from both physicians.

On May 7, 1979, the trial court overruled the appellant's motion and commenced the trial. The trial court ruled on the motion when no evidence was received to show the appellant was in any way incompetent to stand trial. The written report of a psychologist was presented to the court; the report stated the psychologist believed the appellant was competent, understood the nature of the trial, and could assist in his defense. The appellant's counsel informed the court of a telephone conversation with the second physician, a psychiatrist, who had not completed his written report, but had concluded the appellant was competent to stand trial. The trial court, having no evidence of appellant's lack of competence, and having personally observed no bizarre or abnormal activity by the appellant, denied the appellant's motion.

When the accused's competency to stand trial is in question pursuant to K.S.A. 1979 Supp. 22-3302, the determination is for the trial court after conducting a hearing. K.S.A. 1979 Supp. 22-3302(3), using the permissive language "may," and "or," offers several *options* to *assist the trial court* in making the determination of competency. The trial court may impanel a six-person jury; the court may commit the accused for a psychiatric evaluation, up to 120 days; the court may permit the accused to be evaluated in a mental health clinic or in a jail; or the court may appoint two qualified physicians to examine the accused. The record indicates the trial court, at the appellant's request, chose the statutory option to have the appellant examined by two physicians.

The appellant contends that once the question of competency is raised, there must be an evidentiary hearing where the accused has the opportunity to present evidence and question the court appointed physicians. The appellant presents no authority supporting the need for a full blown adversary hearing to determine competency. Clearly, the statute does not require such a hearing. The statute and our prior decisions leave the question of the accused's competency in the discretion of the trial court. Absent an abuse of discretion the trial court's determination will not be reversed on appeal. See *State v. Soles,* 224 Kan. 698, 700, 585 P.2d 1032 (1978); *State v. Hamrick,* 206 Kan. 543, 547, 479 P.2d 854 (1971). The trial court provided a hearing on the question of competency, by giving the appellant's counsel the opportunity to

present evidence of incompetency. No such evidence was presented. On the contrary, the evidence presented, in the form of physicians reports, points only to the appellant's competency. The trial court in making its own finding of competency remarked that all evidence supported competency. K.S.A. 22-3301. We are satisfied the trial court committed no error in refusing to grant a continuance, and in finding the appellant competent to stand trial.

The appellant contends the trial court committed error in refusing to admit certain evidence. The appellant proffered several photographs and a film as demonstrative evidence of what James Joyner could have seen as he drove his truck into the rest area. The appellant's proffered film and photographs were taken in April 1979 at the rest area. The film attempts to show Joyner's view from the cab of his truck and to recreate the scene of the crime so the jury could test Joyner's credibility and observation abilities. Joyner testified he saw an arm or part of a human body; he saw what appeared to be someone getting in or out of the cab of the appellant's truck. Joyner testified he saw the wheels of the trailer run over a body.

The trial court viewed the film and photographs and refused to admit them into evidence. The trial court stated there were significant differences in condition between the film and photographs and the actual scene. The film and photographs were taken in April, three months after the January crime. Snow and ice were on the ground in January; the ground was clear in April. The crime occurred in the evening, when the rest area overhead lights were operating. The April photographs and film were taken in the daylight. The film showed several repetitious, but slightly different, views from the driver's seat of a truck entering the rest area. The trial court stated the film and photographs would be confusing to the jury and would not be of any assistance in determining the issues in the case.

Still photographs and motion pictures, if shown to be a likeness of what they purport to represent, are, in the discretion of the trial court, admissible in evidence as aids to the trier of fact in arriving at an understanding of the evidence, the location or condition of an object, or the circumstances of an accident when any such matter is relevant. *Howard v. Stoughton,* 199 Kan. 787, Syl. ¶ 1, 433 P.2d 567 (1967); see *State v. Emery,* 201 Kan. 174, 440 P.2d

613 (1968); *State v. Woolridge,* 2 Kan. App. 2d 449, 581 P.2d 403, *rev. denied* 225 Kan. 846 (1978); Annot., 19 A.L.R.2d 877. The proffered film was similar to a proffered demonstration or a request to view the scene of a crime. These are matters resting in the sound discretion of the trial court. Exercise of that discretion will not be overturned on appeal unless its abuse is apparent. See *State v. Morton,* 217 Kan. 642, 538 P.2d 675 (1975). Joyner's credibility, and the appellant's theory that the victim was attempting to climb into the truck, could be tested and developed through the examination of witnesses. We are satisfied the trial court did not abuse the exercise of its power of discretion in ruling the film and photographs were confusing, and in finding they represented completely different conditions at the rest area.

The appellant challenges the trial court's instructions to the jury. He contends that when a case is wholly or substantially dependent on circumstantial evidence and no instruction is given which defines reasonable doubt, an instruction on circumstantial evidence is required. The appellant relies on our decision in *State v. Wilkins,* 215 Kan. 145, 523 P.2d 728 (1974).

We adhere to the position that it is not necessary to define the words "reasonable doubt." It is to be presumed the jury understood what the words "reasonable doubt" meant. The idea intended to be expressed by these words can scarcely be expressed so truly or so clearly by any other words in the English language. *State v. Larkin,* 209 Kan. 660, 662, 498 P.2d 37 (1972); see *State v. Glazer,* 223 Kan. 351, 360, 574 P.2d 942 (1978); *State v. Taylor,* 212 Kan. 780, 785, 512 P.2d 449 (1973); *State v. Allen,* 5 Kan. App. 2d 31, 609 P.2d 219 (1980). The trial court properly instructed on burden of proof, presumption of innocence, and reasonable doubt using PIK Crim. 52.02. We also adhere to the proposition that a proper instruction on "reasonable doubt" as applied to all kinds of evidence gives the jury an appropriate standard upon which to make a determination of guilt or innocence; to instruct further on the probative force of circumstantial evidence is to invite the confusion of semantics. *State v. Glazer,* 223 Kan. at 360; *State v. Wilkins,* 215 Kan. at 156; see *State v. Peoples,* 227 Kan. 127, 135, 605 P.2d 135 (1980).

The appellant contends the trial court erred in refusing to give a requested instruction on inferences and presumptions. In essence, the appellant contends that because of the circumstantial

nature of the evidence, the jury could only have arrived at a verdict of guilty by impermissibly basing inference on inference, or presumption on presumption. See *State v. Doyle*, 201 Kan. 469, 441 P.2d 846 (1968). We have reviewed the instructions on burden of proof, and the evidence in this case, and are satisfied the trial court did not abuse the exercise of its power of discretion in refusing the requested instruction. The evidence, although circumstantial in nature, placed the appellant at the rest area for approximately one hour (from 7:00 to 8:00 p.m.) on January 6, 1979. An eyewitness, Joyner, testified he saw an arm, leg, or body at truck cab level, and then saw the body being run over by the trailer wheels. The victim's hands were tied behind her back, her slacks were partially unzipped, and traces of seminal fluid were found on her slacks and in the appellant's sleeping bag.

Finally, the appellant contends the trial court erred in giving the instruction on presumption of intent, PIK Crim. 54.01. This point has no merit. See *State v. Egbert*, 227 Kan. 266, 267, 606 P.2d 1022 (1980); *State v. Acheson*, 3 Kan. App. 2d 705, 601 P.2d 375 (1979), *rev. denied* 227 Kan. 927 (1980); PIK Crim. 54.01 (1979 Supp.).

The judgment of the lower court is affirmed.

HOLMES, J., concurring in part and dissenting in part:

While I concur in the result reached in the majority opinion, I respectfully dissent from Syl. ¶ 3 and the corresponding portion of the opinion. Since authoring the opinion of the court in *State v. Johnson*, 223 Kan. 237, 573 P.2d 994 (1977), I have become increasingly concerned about the practice of law enforcement officers taking statements from persons accused of criminal activity after such person is represented by counsel and the officers have knowledge of such representation. As stated in *Johnson*, this court recognizes the right of an accused who is represented by counsel to waive his right to counsel and make a statement or subject himself to interrogation without any notice to or advice from his counsel. I am now convinced that this is a violation of a defendant's constitutional right to the effective assistance of counsel.

In *People v. Tompkins*, 45 N.Y.2d 748, 380 N.E.2d 311 (1978), *cert. denied*, 440 U.S. 939 (1979), the New York Court of Appeals considered the problem and stated:

" '[O]nce a lawyer has entered a criminal proceeding representing a defendant in connection with criminal charges under investigation, the defendant in custody may not waive his right to counsel in the absence of the lawyer' (*People v. Hobson,* 39 NY2d 479, 481). The People concede, as they must, that an attorney representing defendant had entered the criminal proceeding but contend that defendant waived his rights, urging that the waiver was made with the assistance of counsel simply because he had talked with his counsel on the phone. This attenuated interpretation of the meaning of 'presence of counsel' is totally unacceptable. Such a theory runs completely afoul of the very basis of the rule enunciated in *Hobson* (p 484), where we said so clearly that '[t]he rule that once a lawyer has entered the proceedings in connection with the charges under investigation, a person in custody may validly waive the assistance of counsel only in the presence of a lawyer breathes life into the requirement that a waiver of a constitutional right must be competent, intelligent, and voluntary.' If a mere telephone call from counsel would serve this function it would be a short breath indeed.

"The only remaining question is whether defendant's statement constitutes a spontaneous admission under the rule enunciated in *People v. Kaye* (25 NY2d 139). Unlike the situation in that case, the defendant here made no 'spontaneous volunteered admission' at all. At best, it could be considered only as an attempt to make a spontaneous volunteered waiver of his right to counsel. It is suggested that we expand the *Kaye* rationale and hold that the making of his waiver thereby purifies the subsequent interrogation. We decline to do so. The *Hobson* rule is an unequivocal protection of basic rights guaranteed by our Constitution (*People v. Hobson,* 39 NY2d 479, 483, *supra; People v. Arthur,* 22 NY2d 325, 328) and once an attorney has entered a criminal proceeding on behalf of a defendant, the defendant in custody may not waive his right to counsel, spontaneously or otherwise, in the absence of the lawyer." pp. 750-751.

In my view the rule adopted by the New York court as set forth in *Tompkins* and *Hobson* is not only preferable but necessary to protect the constitutional rights of an accused. However, based upon the other independent evidence in the case at bar, I would consider the error in this case to be harmless beyond a reasonable doubt and concur with the ultimate result.

HERD, J., joins the foregoing concurring and dissenting opinion.