**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 15 2002**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

NOBLE LEROY JOHNSON,

      Petitioner - Appellant,

v.

DAVID R. MCKUNE; ATTORNEY
GENERAL OF KANSAS,

      Respondents - Appellees.

No. 00-3113

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. No. 97-CV-3269-DES)**

Stephen W. Kessler, Topeka, Kansas, for Petitioner - Appellant.

Jared S. Maag, Assistant Attorney General, Office of the Kansas Attorney General, Topeka, Kansas, for Respondents - Appellees.

Before **BRORBY** and **HOLLOWAY,** Senior Circuit Judges, and **HENRY**, Circuit Judge.

**HOLLOWAY**, Senior Circuit Judge.

**I**

On March 25, 1976, Noble Leroy Johnson was convicted in the district court of Butler

County, Kansas of two counts of first degree murder and given two concurrent life sentences.

The Kansas Supreme Court affirmed his convictions on December 10, 1977. *State v. Johnson*, 573 P.2d 994 (Kan. 1977). From 1981 to 1994 Johnson filed four post-conviction motions pursuant to Kan. Stat. Ann. § 60-1507, all unsuccessful, in the Kansas state courts. The first, second and fourth of these raised the issue that a jury instruction pertaining to intent similar to an instruction given at Johnson's trial had been declared unconstitutional by the United States Supreme Court in *Sandstrom v. Montana*, 442 U.S. 510 (1979). In all three instances, the Kansas courts denied Johnson relief, holding that this issue had been waived and defaulted.

In 1997 Johnson, then an inmate in Lansing Correctional Facility in Lansing, Kansas, petitioned the United States District Court for the District of Kansas for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. On March 30, 2000, the District Court found the *Sandstrom* issue not to have been defaulted or waived because *Sandstrom* was not decided until after Johnson's conviction was final and because he had raised the issue in his first motion and appealed its denial to the highest state court. *Johnson v. McKune*, No. 97-3269-DES, 2000 WL 422340 at *3-4 (D.Kan. Mar. 30, 2000). However, the court held that the ruling in *Sandstrom* was not retroactively applicable on collateral review under *Teague v. Lane*, 489 U.S. 288 (1989). *Id.* at *4-5, and denied habeas relief and dismissed the action.

Johnson now appeals the District Court's denial of the writ. On November 2, 2000 we granted a certificate of appealability as to Johnson's claim that *Sandstrom* should be applied retroactively to the jury instruction issue. We exercise jurisdiction under 28 U.S.C.

§ 1291. For reasons set forth below, we affirm the District Court's decision.

**II**

In September 1975, Thomas and Darlene Woodyard were murdered in El Dorado, Kansas. The Woodyards were friends of Noble Leroy Johnson and his wife Linda, and had eaten dinner at their house a few hours before the murders. The bodies were discovered three days later when the Woodyards' landlady entered the house. Both victims had been stabbed, their throats cut, and their bodies mutilated. Trial Transcript at 89, 95.

Linda Johnson, questioned separately from her husband, gave testimony implicating her husband. According to her testimony, Noble Johnson fought with both victims after dinner, injuring them. After apologizing, he walked home with them. After returning home, her husband told her he was going to go back and kill them. She heard her husband using his knife sharpener before he left. He returned 35 to 45 minutes later, demanding that she wash his bloody clothing, telling her that Darlene had been the hardest to go, and saying that God would never forgive him for what he had done. She also said that Johnson threatened to kill her if she revealed what had happened. Trial Transcript at 16-26. A witness said he had seen Noble Johnson crouching by the river behind the Woodyards' house the day before the bodies were discovered. Trial Transcript at 65-66.

The undersheriff said Johnson told him what happened the night of the murders. According to the undersheriff, Johnson said he had drunk six beers and half a pint of whiskey that evening and admitted being in the Woodyards' house with a knife, but Johnson had said

- 3 -

that Thomas Woodyard killed Darlene Woodyard in another room. Johnson said he became very angry at this and hit Thomas Woodyard. Thomas, Johnson said, then attacked him with a knife, cutting his hand. After this, Johnson said everything went "dark and blank," which frightened him. Johnson said that because the doors were locked from the inside, he dived out the window. He said he then threw the knife into the river behind the Woodyards' house and returned home. However, the undersheriff said Johnson never indicated he remembered killing anyone. Trial Transcript at 158-61.

Johnson also took the stand, providing a similar but somewhat less intelligible explanation of the evening's events. Johnson said he believed Thomas Woodyard had killed Darlene Woodyard in another room. Johnson said he was angry at this, and that he "got all mixed up," thinking Darlene was his own daughter. Johnson admitted hitting Thomas Woodyard, somehow cutting his own hand. He testified that after this, things became dark and he immediately escaped through the window and ran home. Trial Transcript at 197-201.

Johnson's position at trial was that he was not guilty by reason of insanity. He introduced testimonial evidence in support of this defense, including his own testimony, the testimony of his parents and siblings, and the testimony of a psychiatrist who had examined him at the state's request.

The prosecution offered rebuttal evidence that included the testimony of a different psychiatrist. The two psychiatrists agreed that Johnson was troubled, but disagreed both as to the degree of his psychological problems, and also as to whether Johnson could distinguish

- 4 -

between right and wrong at the time of the murders.

At trial, the jury was given the following instruction regarding a legal presumption of intent:

> There is a presumption that a person intends all the natural and probable consequences of his voluntary acts. This presumption is overcome if you are persuaded by the evidence that the contrary is true.[1]

The jury was also given instructions that the state had to prove Johnson's sanity beyond a reasonable doubt, and that it bore the burden of proof concerning Johnson's guilt. Trial Transcript at 525-27 (Instructions 9, 13).

Johnson did not, either at trial or on appeal, challenge the intent instruction. At that time, the instruction was in widespread use in Kansas, although it was later criticized by the Kansas Court of Appeals, which indicated that it would no longer approve such an instruction. *State v. Acheson*, 601 P.2d 375, 384, *rev. denied* 606 P.2d 1022 (1979), *cert. denied* 449 U.S. 965 (1980). The instruction was then modified, and has since been abandoned altogether. *Compare* PIK 2d 54.01 *and* 54.01-A *with* PIK 3d 54.01 (omitting modified presumption of intent instruction).

---

[1]PIK 54.01 (1971).

# III

## A

### *Whether This Court Can Consider Johnson's* Sandstrom *Claim*

Because Johnson filed his petition with the United States District Court in 1997, the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), effective April 24, 1996, applies to this case. Ordinarily, under AEDPA a federal court may grant a petitioner a writ of habeas corpus only if the state court's adjudication of the claim on the merits

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.[2]

28 U.S.C. § 2254(d). On the other hand, "[i]f the claim was not heard on the merits by the state courts, and the federal district court made its own determination in the first instance, we review the district court's conclusions of law *de novo* . . . ." *La Fevers v. Gibson*, 182 F.3d 705, 711 (10th Cir. 1999).

The Kansas Court of Appeals concluded that under Kansas Supreme Court Rule 183(c)(3), Johnson's *Sandstrom* claim was not subject to review because he had failed to raise the issue on direct appeal. It added, however, that Johnson's claim was "one previously rejected by this Court," citing *State v. Acheson*, 601 P.2d 375 (Kan. 1979); *State v. Egbert*

---

[2]Johnson argues in favor of an exception only under § 2254(d)(1), not § 2254(d)(2).

- 6 -

606 P.2d 1022 (Kan. 1980); *State v. Myrick & Nelms*, 616 P.2d 1066 (Kan. 1980); *State v. McDaniel & Owens*, 612 P.2d 1231 (Kan. 1980). Memorandum Opinion of March 31, 1983. The federal District Court's opinion implicitly rests on the assumption that the Kansas Court of Appeals decided the *Sandstrom* claim on its merits. *See Johnson*, 2000 WL 422340 at *1, *3 (applying AEDPA's "contrary to, or involv[ing] an unreasonable application of, clearly established Federal law" provision). However, Johnson asks us to apply the *de novo* standard of review, pointing out that while the Kansas state courts did opine that he was not entitled to relief on the merits, they found that his claim was procedurally barred. Brief of Appellant at 3.

We agree with the District Court's reasoning that Johnson, having raised the *Sandstrom* claim in the first of his four post-conviction motions, did not waive his claim by failing to raise it in all successive motions or appeal its denial, either of which would have been futile. *Johnson,* 2000 WL 422340 at *4. We believe the denial of Johnson's first motion serves as an adjudication on the merits by the state court. Here, it appears that the state court relied on the merits as an alternative basis for its holding, which is permissible. *See Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989) (noting that state courts may both rely on state procedural bars and reach federal substantive questions in denying habeas relief). *See also Michigan v. Long*, 463 U.S. 1032, 1040-41 (1983) (stating the Court's intention to accept federal substantive law as the basis for a state court's habeas denial where both state and federal grounds were mentioned but where it was not apparent that state grounds were

adequate); *Andrews v. Deland*, 943 F.2d 1162, 1188 (10th Cir. 1991) (stating the presumption that a state court decision rests on federal substantive grounds in the absence of a clear statement to the contrary and explaining that this presumption arises where the decision "fairly appears . . . to be interwoven with federal law.") (quoting *Coleman v. Thompson*, 501 U.S. 722, 737 (1991)).

Because we agree with the District Court's holding that no procedural default barred Johnson's claim, we conclude that federal substantive law is the only basis on which the state court's denial of habeas relief now rests. We therefore think the District Court was correct in believing that the Kansas Court of Appeals did dispose of Johnson's claim on the merits. We need not resolve any apparent conflict here, however, since even under the more lenient *de novo* standard which Johnson requests, we find that he cannot prevail.

B

1

*The* Sandstrom *Holding*

*Sandstrom* is premised on the holding of *In re Winship* that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). At issue in *Sandstrom* was a jury instruction quite similar to that given at Johnson's trial, namely "the law presumes that a person intends the ordinary consequences of his voluntary acts." *Sandstrom*, 442 U.S. at 512. The *Sandstrom* Court considered "the

way in which a reasonable juror could have interpreted the instruction" as determinative of "whether a defendant has been accorded his constitutional rights." *Id.* at 514. The Court determined that a reasonable juror "could easily have viewed such an instruction as mandatory," *id.* at 515, and concluded that such an instruction therefore violated a criminal defendant's right to procedural due process. The result of such a conclusion by a juror would have been to shift to the defendant the burden of proof on the issue of intent. *Id.* at 518-521.

In particular, the Court suggested that a reasonable juror might have understood that the presumption was either conclusive (that is, the instruction was "an irrebuttable direction by the court to find intent once convinced of the facts triggering the presumption"), or else that it was "a direction to find intent upon proof of the defendant's voluntary actions (and their 'ordinary' consequences), unless *the defendant* proved the contrary by some quantum of proof which may well have been considerably greater than 'some' evidence." *Id.* at 517. The Court did not determine that a reasonable juror would have interpreted the instruction in either of these impermissible ways. Rather, it found only the risk of such a conclusion by jurors impermissibly great:

> We do not reject the possibility that some jurors may have interpreted the challenged instruction as permissive . . . .[3] However, the fact that a reasonable juror could have given the presumption conclusive or persuasion-shifting

---

[3]Mandatory presumptions, unlike permissive inferences, must be measured against the *Winship* standard as explained in *Sandstrom. Francis v. Franklin*, 471 U.S. 307, 314 (1985). A permissive inference instruction violates the Due Process Clause "only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury." *Id.* at 314-15.

- 9 -

effect means that we cannot discount the possibility that Sandstrom's jurors actually did proceed upon one or the other of these latter interpretations. And that means that unless these kinds of presumptions are constitutional, the instruction cannot be adjudged valid.

*Id.* The Court considered whether these other possible interpretations of the instruction by the jury might have the effect "of relieving the State of the burden of proof enunciated in *Winship* on the critical question of petitioner's state of mind," and concluded "that under either of the [other two] possible interpretations of the instruction . . . , precisely that effect would result, and that the instruction therefore represents constitutional error." *Id.* at 521.

2.

*Whether the Kansas State Courts Were Bound
to Apply* Sandstrom *Retroactively on Collateral Review*

In 1977, when Johnson's convictions became final, the instruction at issue here was accepted by Kansas courts. Johnson argues that "the law clearly provided at the time that an accused was presumed to be innocent and that one could not be convicted of a crime without proof beyond a reasonable doubt of each and every element of the offense." Brief of Appellant at 5. He cites several Supreme Court cases in support of this reasoning, including *In re Winship*, 397 U.S. 358 (requiring the prosecution to prove beyond a reasonable doubt every fact necessary to constitute the crime charged). He also cites *Morissette v. United States*, 342 U.S. 246 (1952), and *United States v. U.S. Gypsum Co.*, 438 U.S. 422 (1978), and *Sandstrom*'s reliance on them in its analysis. *Sandstrom*,

442 U.S. at 519 ("It is the line of cases . . . exemplified by *In re Winship* that provides the appropriate mode of constitutional analysis for these kinds of presumptions.") (citation omitted). These opinions had been issued at the time the Kansas Court of Appeals here issued its Memorandum Opinion in March of 1983 rejecting Johnson's state habeas claim and would all constitute "clearly established Federal law, as determined by the Supreme Court of the United States" as required under AEDPA.

However, in considering the Kansas Court of Appeals' adjudication of Johnson's habeas claim, we note that at the time the court was bound by *Morissette*, *In re Winship*, and *U.S. Gypsum*. While the Supreme Court relied on this line of cases, they did not, taken together, constitute "clearly established Federal law;" rather, they together "provide[d] the appropriate mode of constitutional analysis for [the] kinds of presumptions" *Sandstrom* examined. *Sandstrom*, 442 U.S. at 519.

The Kansas Court of Appeals would have been bound to apply *Sandstrom* retroactively only if "clearly established Federal law, as determined by the Supreme Court of the United States" required it. 28 U.S.C. § 2254(d)(1). As our analysis below indicates, we do not believe that *Sandstrom* should be applied retroactively on federal collateral review. More importantly, however, the Supreme Court has never held *Sandstrom* retroactive.[4] Therefore, the Kansas Court of Appeals' adjudication of

---

[4]The question of whether principles of retroactivity set forth in *Teague*, 489 U.S. at 311-313, might require retroactive application of a rule is separate from the question of whether the Supreme Court has already established that the same rule should be applied

Johnson's claim on the merits (assuming, as noted, that the court so adjudicated it) was not contrary to, nor did it involve an unreasonable application of clearly established Federal law, as determined by the Supreme Court. Under these circumstances, AEDPA would forbid our granting the writ Johnson seeks.

3.

*Whether This Court Should Now Apply* Sandstrom *Retroactively*

a.

*Standards for Conducting Retroactivity Analysis*

In convicting Johnson, the jury necessarily found that he had committed the killings. However, the issue of whether the jury properly found intent, which is an element of the crimes charged, is problematic. Because Johnson's convictions became final in 1977 and *Sandstrom* was decided in 1979, his claim rests on the argument that *Sandstrom* should be applied retroactively. In order to conduct a review *de novo* and reach this issue, we would have to find that the Kansas state courts had not adjudicated Johnson's claim on the merits. However, even granting such a review, we must nevertheless deny Johnson the relief he seeks.

We have previously applied *Sandstrom* and *Francis v. Franklin*, 471 U.S. 307 (1985), to find the jury instruction in PIK 54.01, read together with other instructions,

---

retroactively. *See Tyler v. Cain*, 121 S.Ct. 2478, 2479-80 (2001) (separating the issue of whether the Supreme Court had already made a similar jury instruction ruling retroactive from the issue of possible retroactive application in future cases).

constitutionally deficient. *Wiley v. Rayl*, 767 F.2d 679 (10th Cir. 1985). Our reasoning was that "a reasonable juror . . . could have read the instructions as a whole as shifting the burden of persuasion" on the issue of intent to the defendant. *Id.* at 681. We note also that, while Johnson relied on a defense of insanity which the jury necessarily rejected when it convicted him,[5] Johnson's *Sandstrom* claim deals with his *intent*. While the issue of Johnson's mental health or capacity is obviously related to the issue of his mental state, the two are not the same.[6]

There is no question that *Sandstrom* is applicable to cases decided after it was issued. However, in order to determine whether *Sandstrom* should be applied retroactively here so as to authorize us to grant Johnson the relief he now seeks, we look to the principles of retroactivity set forth by a plurality of the Supreme Court in *Teague*, 489 U.S. at 311-13, and reaffirmed by a majority of the Court in *Penry v. Lynaugh*, 492 U.S. 302 (1989).

---

[5]The trial court applied the M'Naghton test, "that is, whether the accused was capable of distinguishing between right and wrong at the time of the commission of the crime." *State v. Johnson,* 573 P.2d at 997.

[6]The Supreme Court has distinguished the two issues, holding that states may require defendants to bear the burden of proving their affirmative defense of insanity, though they may not require defendants to bear the burden of proving their mental state where mental state (such as intent) is an element of the crime. *Patterson v. New York*, 432 U.S. 197, 206 (1977) ("[O]nce the facts constituting a crime are established beyond a reasonable doubt, based on all the evidence including the defendant's mental state, the State may refuse to sustain the affirmative defense of insanity unless demonstrated by a preponderance of the evidence."). Here, however, we note that the jury instructions required the state to prove beyond a reasonable doubt Johnson's sanity during the commission of the murders. Trial Transcript at 525-26 (Instruction 9).

In *Teague* the Court considered the intrusiveness and the inordinate and overwhelming burden that widespread retroactivity would have on the states' judicial resources, noting that such application "*continually* forces the States to marshal resources in order to keep in prison defendants whose trials and appeals conformed to then-existing constitutional standards." *Teague*, 489 U.S. at 310. The Court also weighed the need for finality in criminal adjudications, observing that "[s]tate courts are understandably frustrated when they faithfully apply existing constitutional law only to have a federal court discover, during a [habeas] proceeding, new constitutional commands." *Id.* (citations omitted) (alterations in original).

Persuaded by these weighty considerations, the Court announced a new standard for the retroactive application of new rules: "Unless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." *Id.* The Court later explained that this "'new rule' principle . . . validates reasonable, good-faith interpretations of existing precedents made by state courts even though they are shown to be contrary to later decisions." *Butler v. McKellar*, 494 U.S. 407, 414 (1990). The Court has also said that it would "not disturb a final state conviction or sentence unless it can be said that a state court, at the time the conviction or sentence became final, would have acted objectively unreasonably by not extending the relief later sought in federal court." *O'Dell v. Netherland*, 521 U.S. 151, 156 (1997). Nonretroactivity under *Teague* is

- 14 -

considered a defense to habeas claims and courts must entertain it where, as here, the state has raised it. *Goeke v. Branch*, 514 U.S. 115, 117 (1995).

b.

*Whether* Sandstrom *Announced a New Rule*

In order to determine whether *Sandstrom* should be applied retroactively, we must first determine whether it is a "new rule" as contemplated by *Teague* and, if so, whether it falls within one of the exceptions to the rule. In determining whether a rule is new, a court conducting habeas review "considers whether a state court considering [the defendant's] claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule [he] seeks was required by the Constitution. If not, then the rule is new." *O'Dell*, 521 U.S. at 156 (citations and quotation marks omitted). A rule is new when it "breaks new ground or imposes a new obligation on the States or the Federal government" or if it "was not *dictated* by precedent existing at the time the defendant's conviction became final." *Teague*, 489 U.S. 288, 301. A rule is not new where precedents "inform, or even control or govern" but do not "compel" its creation. *Saffle v. Park*s, 494 U.S. 484, 491 (1990). Furthermore, the Court has explained that

> the fact that a court says that its decision is within the "logical compass" of an earlier decision, or indeed that it is "controlled" by a prior decision, is not conclusive for purposes of deciding whether the current decision is a "new rule" under *Teague*. Courts frequently view their decisions as being "controlled" or "governed" by prior opinions even when aware of reasonable contrary conclusions reached by other courts.

- 15 -

*Butler*, 494 U.S. at 415.  The burden of demonstrating that a rule is not new falls on  the habeas applicant.  *O'Dell*, 521 U.S. at 156.

The Sixth Circuit has considered this question and, analyzing the precedents on which *Sandstrom* relied, has determined that it "was not controlled or governed by any particular precedent, but was the result of an analysis of cases generally dealing with the presumption of innocence and the allocation of the burden of proof."  *Cain v. Redman*, 947 F.2d 817, 821 (6th Cir. 1991), *cert. denied* 503 U.S. 922 (1992).  Other circuits have likewise concluded that  *Sandstrom* announced a new rule.  *Prihoda v. McCaughtry*, 910 F.2d 1379, 1382 (7th Cir. 1990); *Hall v. Kelso*, 892 F.2d 1541, 1543 n.1 (11th Cir. 1990). *But see Mains v. Hall*, 75 F.3d 10, 14 (1st Cir. 1996) (reasoning that because *Sandstrom* was "a lineal descendant of *Winship*" it therefore did not announce a new rule) (quoting *Gilmore v. Taylor*, 508 U.S. 333, 343 (1993)).

Although *Sandstrom* was a unanimous opinion which strongly came out against the kind of instruction given at Johnson's trial, we are not convinced that its ruling was dictated or compelled by precedent as contemplated by *Teague*.  The *Sandstrom* Court described its decision-making process as follows:  "It is the line of cases urged by petitioner, and exemplified by *In re Winship* that provides the appropriate mode of constitutional analysis for these kinds of presumptions."  *Sandstrom*, 442 U.S. at 519 (citation omitted).  In so deciding, the Court rejected other lines of cases urged by the respondent, the State of Montana.  *Id.* at 519, n.9.  The fact that contrary federal or state precedent exists, while not

dispositive, is relevant to our analysis. *Caspari v. Bohlen*, 510 U.S. 383, 394-95 (1994) (looking to both state and federal decisions to determine whether a new rule had been announced).

While it is apparent that the Court heavily relied on precedent to reach the result, there is no indication that the Court thought that precedent "dictated" or "compelled" the result. We are mindful that in later cases the Court has used language suggesting it considered *Sandstrom* to have announced a new rule. *See, e.g., Yates v. Aiken*, 484 U.S. 211 (1988) (explaining that *Sandstrom* "*established* that the Due Process Clause of the Fourteenth Amendment prohibits jury instructions that have the effect of relieving the State of its burden of proof . . . .") (emphasis added). Furthermore, we note that at least one case *Sandstrom* cites and substantially relies upon, *U.S. Gypsum*, 438 U.S. 422, was decided after Johnson's convictions became final and was thus unavailable to the Kansas state courts at trial or on direct appeal.

While the Kansas state courts had some reason to believe the instruction at issue here might have presented a due process problem, *Teague* requires more than this. We are convinced that the Kansas state courts, "considering [Johnson's] claim at the time his conviction became final" would not "have felt compelled by existing precedent to conclude that the rule [he now] seeks was required by the Constitution." *O'Dell*, 521 U.S. at 156 (citations and quotation marks omitted). Accordingly we hold that *Sandstrom* announced a new rule.

c.

*Whether the New Rule Announced in* Sandstrom
*Falls Within an Exception to Nonretroactivity Under* Teague

*Teague* forbids the retroactive application of a new rule on collateral review unless it falls within one of two narrow exceptions. *Tyler*, 121 S.Ct. at 2479. The exceptions include only rules that

> place[] certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe, or . . . require[] the observance of those procedures that . . . are implicit in the concept of ordered liberty. . . .

*Teague,* 489 U.S. at 290 (citations and quotation marks omitted). Johnson presents only a cursory assertion that the first exception might apply, and offers no argument or citation to authority for that proposition. It is clear, however, that *Sandstrom* does not place any conduct beyond the state's power to proscribe, as contemplated by *Teague* and its progeny.[7] "Plainly, this exception has no application here because the rule [Johnson] seeks would [not] decriminalize a class of conduct . . . ." *Graham v. Collins*, 506 U.S. 461, 477 (1993). Even if the exception were to apply in this situation, however, our inquiry would be subsumed within our analysis of the second exception.

The second exception, which Johnson urges much more forcefully, covers rules requiring procedures that are "implicit in the concept of ordered liberty." *Teague,* 489

---

[7]This exception was broadened somewhat in *Penry*, 492 U.S. 302, to include rules immunizing certain classes of defendants (there, a mentally retarded man) from certain types of punishment (there, the death penalty). The broader exception is not applicable here.

U.S. at 290 (citation and quotation marks omitted). The Supreme Court has defined this exception narrowly, *Butler*, 494 U.S. at 417 (characterizing the two exceptions to nonretroactivity as "narrow"), and has reserved the second exception only for "watershed rules of criminal procedure." *Teague* at 311. *See also Parks*, 494 U.S. at 495 (requiring "primacy and centrality" before a rule can be considered "watershed," and citing as an example the rule announced in *Gideon v. Wainwright*, 372 U.S. 335 (1963), that criminal defendants charged with serious offenses have the right to be represented at trial by counsel). Such rules must "implicat[e] the fundamental fairness and accuracy of the criminal proceeding." *Parks*, 494 U.S. at 495. The standard required for a rule to qualify for retroactivity under *Teague*'s second exception is high, and only "a small core of rules" can meet it. *Graham*, 506 U.S. at 478. The Supreme Court expressed its belief that such "watershed" rules were rare: "Because we operate from the premise that such procedures would be so central to an accurate determination of innocence or guilt, we believe it unlikely that many such components of basic due process have yet to emerge." *Teague*, 489 U.S. at 313.

The circuits' earlier opinions examining the retroactivity of *Sandstrom* are split. The Eleventh Circuit has held the kind of rule announced in *Sandstrom* to fall within the second *Teague* exception, and has applied it retroactively. *Hall*, 892 F.2d 1541, 1543 n.1 (applying *Sandstrom* retroactively). However, the Sixth Circuit has addressed these same issues in *Cain*, 947 F.2d 817, and, after conducting a *Teague* analysis, concluded that

*Sandstrom* should not be applied retroactively. *Id.* at 822. Some courts examining analogous rules have applied them retroactively. The Fifth Circuit, considering a similar rule, determined it should be applied retroactively. *Humphrey v. Cain*, 138 F.3d 552 (5th Cir. en banc 1998) (applying retroactively the rule required under *Cage v. Louisiana*, 498 U.S. 39 (1990), and *Victor v. Nebraska*, 511 U.S. 1 (1994), regarding jury instructions as to reasonable doubt)*, cert. denied*, 525 U.S. 943 (1998) .[8] The Ninth Circuit, examining a court's failure to instruct the jury on any element at all of the charged offense, retroactively applied the rule announced in *Sullivan v. Louisiana*, 508 U.S. 275 (1993), that a constitutionally deficient reasonable doubt instruction requires reversal. *Harmon v. Marshall*, 69 F.3d 963 (9th Cir. 1995).

This court has considered the same issue in an analogous case, *Andrews*, 943 F.2d 1162. There, we considered the rule announced in *Beck v. Alabama*, 447 U.S. 625 (1980), requiring that the jury in a capital case be permitted to consider a verdict of guilty of a lesser included offense if the evidence supports such a conviction. While the *Beck* rule is without question an important one, we concluded in *Andrews* that it was not a "watershed rule" as contemplated by *Teague*. We relied on *Sawyer v. Smith*, 497 U.S.

---

[8]Drawing on *Winship*, *Cage* held that a jury instruction describing reasonable doubt as "grave uncertainty," "moral certainty," or "actual substantial doubt" impermissibly raised the standard of proof beyond that required by the Due Process Clause. *Cage*, 498 U.S. at 40-41. *Cage*'s rule, as the Supreme Court has characterized it, reaches somewhat deeper than *Sandstrom*'s. *Sullivan v. Louisiana*, 508 U.S. 275, 280-81 (1993) (distinguishing "a misdescription of the burden of proof, which vitiates all the jury's findings" from a *Sandstrom* error, which might not).

227 (1990), for the principle that, even where a rule enhanced the reliability or accuracy of a proceeding, "the second [*Teague*] exception is reserved only for rules 'essential to the fairness of the proceeding.'" *Andrews* at 1187 (quoting *Sawyer* at 228).

In the instant case, we realize that application of the *Sandstrom* rule might have enhanced the reliability or accuracy of Johnson's trial. However, the Supreme Court explained the principle given in *Sawyer* still further in *Tyler*:

> To fall within this exception, a new rule must meet two requirements: Infringement of the rule must seriously diminish the likelihood of obtaining an accurate conviction, and the rule must alter our understanding of the bedrock procedural elements essential to the fairness of a proceeding.

121 S.Ct. at 2484 (citations and internal quotation marks omitted). We cannot agree with the Eleventh Circuit's holding in *Hall* that *Sandstrom*'s rule meets both of these requirements.

We accept that the instruction at issue in this case may have "seriously diminish[ed] the likelihood of an accurate conviction." We are not aware of any explanation by the Supreme Court of the meaning of the "serious diminishment" standard, though *Sandstrom* made clear that violation of its rule was serious enough to warrant reversal of a conviction. Although *Sandstrom* did not delve into the issue of the accuracy of a conviction obtained in violation of its rule, the Court did consider unacceptable the level of risk that a conviction might be obtained under a constitutionally impermissible standard. We therefore assume, without deciding, that a *Sandstrom* violation would meet *Tyler*'s first requirement.

With regard to the second requirement, we take note of the Supreme Court's opinion in *Yates*, 484 U.S. 211, on which the Eleventh Circuit relies. There, the Court called

- 21 -

*Winship*'s holding that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged" a "bedrock, axiomatic and elementary constitutional principle." *Yates* at 214 (citations, internal quotation marks, and brackets omitted). *Yates* arose after *Sandstrom* but before *Francis*. The Court relied on *Francis*, explaining that *Francis* did not announce a new rule but was merely an application of the governing principle established in *Sandstrom* and therefore not subject to retroactivity analysis. *Id.* at 211, 216-17. While this means that for our purposes the Court's characterization of *Winship*'s holding is dictum, this court nevertheless "considers itself bound by Supreme Court dicta almost as firmly as by the Court's outright holdings . . . ." *Gaylor v. United States*, 74 F.3d 214, 217 (10th Cir. 1996). We also note that the Court in *Francis* "reaffirm[ed] the rule of *Sandstrom* and the wellspring due process principle from which it was drawn." *Francis*, 471 U.S. at 326.

However, both of these opinions refer to the principle announced in *Winship* upon which *Sandstrom* was predicated, and not *Sandstrom* itself, as "bedrock" or "wellspring." Not every holding that draws on a wellspring rule is itself a wellspring holding. *United States v. Sanders*, 247 F.3d 139, 151 (4th Cir. 2001) ("[W]atershed principles in turn spawn numerous subsidiary questions, which are closer to the constitutional margins. These subsidiary questions may qualify as arguable applications of a bedrock principle, but they are not core guarantees themselves."). We consider it worth noting that *Francis*, 471 U.S. at 326, referred to the *Winship* principle as "wellspring," and "bedrock, axiomatic and

- 22 -

elementary," but in the same sentences the Court refrained from identifying the *Sandstrom* principle as such. Johnson cites no opinion, nor can we find any, where the Supreme Court has made plain that it considers the *Sandstrom* rule to be bedrock or wellspring, or to be one of the extraordinary watershed rules like that announced in *Gideon* requiring procedures "implicit in the concept of ordered liberty."[9]

In examining *Sandstrom* itself, we find no indicia that the Court thought the rule announced there was of the "primacy and centrality" required for retroactivity, *Parks*, 494 U.S. at 495. We do not believe that *Sandstrom* announced one of the rare "watershed rules of criminal procedure" that "alter our understanding of the bedrock procedural elements essential to the fairness of a proceeding," *Tyler*, 121 S.Ct. at 2484. Thus, we hold that the rule in *Sandstrom* is neither a "wellspring" or "bedrock" principle, nor is it a "watershed rule" that "requires the observance of those procedures that . . . are implicit in the concept of ordered liberty." *Teague*, 489 U.S. at 290 (internal quotation marks omitted). While *Sandstrom* provides defendants significant protections in criminal proceedings, the standard required to apply a rule retroactively is high indeed and we do not believe it is met here. Because we hold that the rule announced in *Sandstrom* is not to be applied retroactively in

---

[9]The Second Circuit recently examined all known Supreme Court cases in which the Court was asked to apply a new rule retroactively under *Teague*'s second exception. *United States v. Mandanici*, 205 F.3d 519, 529 (2d Cir. 2000). In none of the eleven such cases did the Court apply a new rule retroactively. *Id.* The Court has, however, cited by way of example the rule announced in *Gideon*, 372 U.S. 335, as a rule that would qualify as "watershed." *Parks*, 494 U.S. at 495. Circuit courts of appeals, of course, have applied some such rules retroactively.

federal collateral review proceedings, Johnson's claim necessarily fails.

**IV**

For these reasons, we hold that Johnson's petition for habeas relief was properly denied. The District Court's decision is therefore

AFFIRMED.

00-3113, *Johnson v. McKune*

**HENRY, Circuit Judge, Dissenting:**

The majority opinion is well-written and as thoughtful as always; nevertheless, in what I admit to be a close and difficult case, I must respectfully dissent. I write separately, first, simply to clarify how I think that AEDPA demands that we analyze this case and, second, because I disagree with the majority's ultimate conclusion that *Sandstrom* should not apply retroactively.

## I. The Scope of our Habeas Jurisdiction

Prior to the passage of AEDPA, we reviewed de novo any legal questions arising under our habeas jurisdiction. After the passage of AEDPA, however, that standard persists only where the state court failed to "adjudicate[] on the merits" the particular issue we are addressing. 28 U.S.C. § 2254(d); *see LaFevers v. Gibson*, 182 F.3d 705, 711 (10th Cir. 1999) ("If the claim was not heard on the merits by the state courts, and the federal district court made its own determination in the first instance, we review the district court's conclusions of law de novo . . ."). Otherwise, we are constrained by the more deferential standard of § 2254(d)(1) (permitting the grant of a writ of habeas corpus only where the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined

by the Supreme Court of the United States"). In a habeas case governed by AEDPA, then, the scope of our review depends upon determination of the ground(s) on which the state court(s) denied relief.

Here, Mr. Johnson raised the *Sandstrom* issue in three of his four state post-conviction petitions. The Kansas state courts denied each petition; we examine the decision of the highest state court to address each relevant petition. Examination of the three relevant decisions reveals four reasons ("adjudicat[ions] on the merits," § 2254(d)) for the Kansas state court denials of relief: (1) Mr. Johnson, after raising the issue in his second petition for post-conviction relief (the 1985 petition) failed to appeal the denial of that petition; (2) Mr. Johnson failed to raise the issue at all in his third petition for post conviction relief (the 1991 petition); (3) Mr. Johnson failed to object, at trial, to the relevant jury instruction; and (4) the relevant jury instruction, in fact, remained constitutional even after *Sandstrom*. Each of the grounds for denial constitutes an adjudication on the merits and thus demands our § 2254(d)(1) deference. Even given this deference, however, the district court rejected grounds (1), (2), and (3). The district court did not explicitly address ground (4), presumably because Kansas failed to raise this argument.

On appeal, Kansas now abandons not only ground (4) but also grounds (1), (2), and (3); instead, Kansas relies only on an argument that *Sandstrom* should not benefit Mr. Johnson because *Sandstrom* should not apply retroactively. In so doing, of course,

Kansas abandons the four grounds on which we would owe § 2254(d)(1) deference: the four issues actually "adjudicated on the merits" by the Kansas state courts. Since the Kansas state courts never relied upon (or even alluded to) the asserted non-retroactivity of *Sandstrom*, those courts did not adjudicate that issue – the issue now before us – on the merits; hence, § 2254(d)(1) is inapplicable and we are governed by our pre-AEDPA standards of review: in this case, de novo consideration of the retroactivity issue.[1]

In sum, then, I agree with the majority opinion that we must address, de novo, the

---

[1] *See, e.g.*, *Battenfield v. Gibson*, 236 F.3d 1215, 1234 (10th Cir. 2001). *Battenfield* holds, albeit implicitly, that § 2254(d)(1) applies on an issue-by-issue basis, even where two particular issues are both part of the same 'claim of error.' In other words, if a claim (in our case, the applicability of *Sandstrom*) features several sub-issues (in our case, (1) does the given jury instruction run afoul of *Sandstrom* and, if so, (2) does *Sandstrom* apply retroactively), § 2254(d)(1) deference applies only to the sub-issue(s) actually adjudicated by the state court. *See Battenfield*, 236 F.3d at 1220 ("Because the [Oklahoma Court of Criminal Appeals (the "OCCA")] never addressed this issue [the prejudice component of Mr. Battenfield's ineffective assistance of counsel claim], we are free to exercise our independent judgment.") (footnote omitted).

This holding is apparent through examination of the analysis conducted by the *Battenfield* court. In *Battenfield*, the OCCA had rejected Mr. Battenfield's appeal based upon Mr. Battenfield's asserted failure to establish the deficient performance prong of his ineffective assistance of counsel claim; the OCCA had not reached consideration of the prejudice prong of the ineffective assistance claim.

The *Battenfield* court granted habeas relief upon making two determinations. The court first concluded that, under the § 2254(d)(1) standard, the OCCA unreasonably applied the relevant precedent in inquiring into whether Mr. Battenfield's attorney rendered deficient assistance. Having determined that Mr. Battenfield's counsel's performance was in fact deficient, the court proceeded to further conclude, now under a de novo standard, that the petitioner had established resultant prejudice. Thus, the *Battenfield* court provided § 2254(d)(1) deference not to every sub-issue of the ineffective assistance of counsel claim but, rather, only to those issues actually adjudicated by the state court.

retroactivity of *Sandstrom*. Since, however, I believe that the Kansas courts did not "adjudicate[] on the merits" the retroactivity issue, I would particularly omit the discussion found within Section III(B)(2) of the majority opinion.

## II. Whether *Sandstrom* Requires Retroactive Application

We turn, then, to the primary issue presented by this appeal: whether, under the law of retroactivity as that law stands today, *Sandstrom* requires retroactive application. As the majority explains, our inquiry proceeds in two steps: (1) Does *Sandstrom* present a "new rule of criminal procedure" and, if so, (2) Is that new rule one of "watershed" importance?[2] *Teague v. Lane*, 489 U.S. 288, 311 (1989). Because I would conclude that *Sandstrom* does not constitute a new rule of criminal procedure (rather, *Sandstrom* merely constitutes an 'old rule'), I do not reach the applicability of the watershed exception.

### A. The Precedent

I begin by looking to the decisions of our sister circuits. The parties identify a circuit split on the issue of whether *Sandstrom* constitutes a new rule for purposes of *Teague* analysis; according to the parties three circuits have concluded that *Sandstrom*

_____

[2] Our case does not implicate the second *Teague* exception, that for new rules "plac[ing] certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe." *Teague*, 489 U.S. at 311 (internal quotation marks omitted).

does constitute a new rule, while one circuit has concluded otherwise. *Compare Cain v. Redman*, 947 F.2d 817, 821-22 (6th Cir. 1991); *Prihoda v. McCaughtry*, 910 F.2d 1379, 1382 (7th Cir. 1990); and *Hall v. Kelso*, 892 F.2d 1541, 1543 n.1 (11th Cir. 1990) (assertedly each standing for the proposition that *Sandstrom* constitutes a new rule) *with Mains v. Hall*, 75 F.3d 10, 14-15 (1st Cir. 1996) (assertedly standing for the proposition that *Sandstrom* does not constitute a new rule). On closer examination, however, these opinions are less helpful than the parties suggest.

First, the Seventh Circuit's opinion in *Prihoda v. McCaughtry*, 910 F.2d 1379 (7th Cir. 1990) is, quite simply, irrelevant to the question before our panel. In *Prihoda*, the Seventh Circuit concluded: "Any federal decision holding instruction 1100 unconstitutional therefore would be a new rule for purposes of *Teague* and could not be applied on collateral review." *Prihoda*, 910 F.2d at 1382. Instruction 1100, as it turns out, is a jury instruction that, under Seventh Circuit precedent, unquestionably remains constitutional after *Sandstrom* – a question settled several years before *Prihoda*. *See, e.g., Fencl v. Abrahamson*, 841 F.2d 760, 770 (7th Cir. 1988) (holding that instruction 1100 remains constitutional after *Sandstrom* and the *Sandstrom* progeny: "[W]e agree with the district court that no constitutional error was committed by the trial court [in] giving Jury Instruction 1100."). The *Prihoda* language quoted above, then, simply states the unremarkable fact that, were the Seventh Circuit to now hold instruction 1100 unconstitutional after-all, that decision would constitute a 'new rule.' Whether or not

-5-

such a decision would constitute a new rule is, of course, entirely irrelevant to the question of whether *Sandstrom* itself constitutes a 'new rule.'

The Eleventh Circuit opinion cited by the parties does address the retroactivity of *Sandstrom*; the opinion, however, does <u>not</u> address whether *Sandstrom* constitutes a new rule for purposes of retroactivity. Rather, in a footnote, the Eleventh Circuit simply concludes: "*Teague* is no bar to the application of *Sandstrom*" because the *Sandstrom* rule constitutes a "bedrock, axiomatic[,] and elementary constitutional principle" that "diminishes the likelihood of an [in]accurate conviction." *Hall*, 892 F.2d at 1543 n.1 (quotation marks omitted). Given this conclusion (that, even if *Sandstrom* does constitute a new rule for *Teague* purposes, *Teague*'s 'watershed' exception is, in any case, applicable), the Eleventh Circuit had no reason to consider whether *Sandstrom* actually constituted a 'new rule.'

We are left, then, with the Sixth Circuit's decision in *Cain* and the First Circuit's decision in *Mains*. The Sixth Circuit concluded that the correctness of the *Sandstrom* holding was, prior to the decision in *Sandstrom* itself, "susceptible to debate among reasonable minds," as evidenced by the apparent "pervasive use" of that instruction just prior to the Court's *Sandstrom* decision. *Cain*, 947 F.2d at 821. Thus, according to the Sixth Circuit, *Sandstrom* constitutes a new rule for purposes of *Teague* analysis. The First Circuit, on the other hand, classified *Sandstrom* as "a lineal descendant of [*In re Winship*, 397 U.S. 358, 364 (1970) (holding that "the Due Process Clause protects the

-6-

accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [the accused] is charged")]." *Mains*, 75 F.3d at 14 (quotation marks omitted). "[*Sandstrom*] simply held that an instruction which creates a presumption of fact violates due process if [that presumption] relieves the State of its burden of proving all of the elements of the offense charged beyond a reasonable doubt." Id. (quotation marks omitted). In short, according to the First Circuit, "[*Sandstrom*] does not constitute a 'new rule'" for purposes of *Teague* retroactivity analysis. Id. at 15.

## B.    Facing the Issue

The issue is close. As the Supreme Court recognized as early as *Teague* itself, determination of whether the holding of a particular case constitutes a 'new rule' is often a task imbued with uncertainty: "It is admittedly often difficult to determine when a case announces a new rule, and we do not attempt to define the spectrum of what may or may not constitute a new rule for retroactivity purposes." *Teague*, 489 U.S. at 301. After careful consideration of the issue, however, I conclude that *Sandstrom* does not constitute a new rule for purposes of *Teague* retroactivity.

I so conclude based upon my understanding of three pre-*Sandstrom* decisions of the Supreme Court; I am convinced that these decisions compelled the *Sandstrom* result: *Winship*, 397 U.S. at 364 (holding, as noted, that "the Due Process Clause protects the

accused against conviction except upon proof beyond a reasonable doubt of every fact

necessary to constitute the crime with which [the accused] is charged."); *Morissette v.*

*United States*, 342 U.S. 246, 275-76 (1952) (holding that the Due Process Clause renders

jury instructions unconstitutional where those instructions direct the jury to presume,

from the defendant's act of taking particular property, an intent to steal that property);

and *Mullaney v. Wilbur*, 421 U.S. 684, 703-04 (1975) (holding that the Due Process

Clause dictates that, as to the intent element of first degree murder, the government bears

the burden of proving, beyond a reasonable doubt, the absence of heat of passion). *See*

*Saffle v. Parks*, 494 U.S. 484, 491 (1990) (holding that a rule is 'old' where existing

Supreme Court precedent "compel[led]" the result in the case providing the relevant

rule).

I need look no further than *Sandstrom* itself for satisfaction that existing precedent

(specifically: *Winship*, *Morissette*, and *Mullaney*) indeed compelled the result in that

case. *Sandstrom*, of course, held unconstitutional a particular jury instruction where that

instruction "had the effect of relieving the State of the burden of proof enunciated in

*Winship* [i.e. the 'beyond a reasonable doubt' burden of proof] on the critical question of

petitioner's state of mind." *Sandstrom v. Montana*, 442 U.S. 510, 521 (1979).

According to *Sandstrom* itself, then, the *Sandstrom* holding is merely an application of

*Winship*.

In applying *Winship*, the *Sandstrom* Court relied on both *Morissette* and

*Mullaney* for guidance. The *Sandstrom* Court noted that, as early as 1952, the *Morissette* Court had observed:

> '[T]he trial court may not withdraw or prejudge the [mens rea] issue by instruction that the law raises a presumption of intent from an act. . . . [Such a presumption] would conflict with the overriding presumption of innocence with which the law endows the accused and which extends to every element of the crime.'

*Sandstrom*, 442 U.S. at 522 (quoting *Morissette*, 342 U.S. at 274-75) (emphasis deleted). Similarly, in *Mullaney*, the Court, four years before *Sandstrom*, had unanimously concluded: "'[The defendant's] due process rights [were] invaded by [a] presumption casting upon him the burden of proving by a preponderance of the evidence that he had acted in the heat of passion upon sudden provocation.'" *Sandstrom*, 442 U.S. at 524 (quoting *Patterson v. New York*, 432 U.S. 197, 214 (1977)).[3]

In light of *Winship*, *Morissette*, and *Mullaney*, then, the *Sandstrom* holding was hardly surprising. Given that the government must prove every element of every crime, specifically including the element of intent, beyond a reasonable doubt, and given that jury instructions shifting the burden of proof on the intent element violate due process,

---

[3] The *Sandstrom* Court also noted the Court's admonition in *Patterson*: "'[A] state must prove every ingredient of an offense beyond a reasonable doubt[] and . . . may not shift the burden of proof to the defendant by presuming that ingredient upon proof of the other elements of the offense.'" *Sandstrom*, 442 U.S. at 524 (quoting *Patterson*, 432 U.S. at 215).

the *Sandstrom* conclusion as to the unconstitutionality of a jury instruction establishing a presumption of intent, upon proof of a voluntary act, was most certainly one "compel[led]" by pre-existing Supreme Court precedent. *Saffle*, 494 U.S. at 491. Indeed, the extent to which prior Court precedent compelled the *Sandstrom* decision is strongly suggested by the Court's *unanimity* in reaching the *Sandstrom* holding.

On the other hand, of course, and as noted by both the majority here and the Sixth Circuit in *Cain*, despite *Winship*, *Morissette*, and *Mullaney*, the *Sandstrom* jury instruction remained in widespread use at the time of the *Sandstrom* decision. Admittedly, this fact suggests some confusion as to whether pre-*Sandstrom* precedent in fact compelled the *Sandstrom* result. The Supreme Court, however, has labeled particular rules as 'old' even where conflicting authority existed at the time that the Court announced the given rule. *See, e.g.*, *Stringer v. Black*, 503 U.S. 222, 230-31 (1992) (giving retroactive effect to the Court's decision in *Clemons v. Mississippi*, 494 U.S. 738, 741 (1990), despite the fact that several pre-*Clemons* lower court opinions held contrary to *Clemons*).

Given, then, my determination that *Sandstrom* itself broke no new ground – but, rather, merely applied existing precedent (*Winship*, *Morissette*, and *Mullaney*) to reach the result those cases compelled[4] – I would conclude that *Sandstrom* did not constitute a

_____

[4] *See also Rose v. Clark*, 478 U.S. 570, 580 (1986) (referring to *Sandstrom* as merely "a logical extension of the Court's holding in [*Winship*] that the prosecution must prove every fact necessary to constitute the crime with which the defendant is charged")

new rule for purposes of *Teague* retroactivity.

---

(quotation marks omitted)